THE FIREWORKS RESTORATION
COMPANY, L.L.C., Respondent,

v.

Michael D. HOSTO, et al., Appellant.

No. ED 97181.

Missouri Court of Appeals,
Eastern District.

May 9, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 28, 2012.

Application for Transfer Denied
Aug. 14, 2012.

Danna McKitrick, David R. Bohm, David A. Zobel, St. Louis, MO, for Appellant.

Bradley J. Bakula, St. Louis, MO, for Respondent.

ROY L. RICHTER, Judge.

Michael Hosto ("Defendant") appeals from the trial court's judgment after a jury returned a verdict in favor of The Fireworks Restoration Company, LLC ("Plaintiff") on its defamation claim and awarded Plaintiff $1 in actual damages and $150,000 in punitive damages. Finding no error, we affirm.

## I. BACKGROUND

The evidence, taken in the light most favorable to the verdict, shows that in 1999 Defendant and Peter Mitchell ("Mitchell") co-founded Plaintiff, a property damage restoration company. The principal business function of Plaintiff was to respond on behalf of a property owner and initiate repair services following the incurrence of property damage. Plaintiff coordinated all facets of restoration, encompassing everything from the initial boarding up of the property immediately after the damage to the final repairs of the property. By working in conjunction with insurance companies, Plaintiff was able to gradually grow and establish itself in the restoration market.

In 2003, Defendant and Mitchell organized 1800 BoardUp, Inc. ("BoardUp"), a company which was to serve as a lead generating service for restoration companies. This new company leased the BoardUp phone number in various area codes, along with BoardUp's Dalmatian logo and marketing system, to restoration contractors nationwide. Plaintiff was the first BoardUp franchisee and licensed use of the BoardUp phone number for five area codes encompassing significant portions of central and eastern Missouri and the southwestern portion of Illinois.

Both BoardUp and Plaintiff remained cooperatively managed by Defendant and Mitchell for another four years. However, following a marked deterioration in their relationship and the commencement of litigation, Defendant and Mitchell dissolved their business associations by entering into a Settlement Agreement in September 2007. As a part of that agreement, Defendant paid Mitchell $35,000 for his interest in BoardUp and Defendant became BoardUp's sole owner. Likewise, Mitchell paid Defendant $80,000 for his interest in Plaintiff and became Plaintiff's sole owner.

These winding-up transactions were not, however, the conclusion of the parties' dealings.

Admittedly upset with the distribution under the Settlement Agreement and angry with Mitchell, Defendant accessed the internet and posted three fictitious, derogatory reviews regarding Plaintiff and its restoration work. The first two reviews were posted on March 31, 2008, on Google and Yahoo, respectively. In those fabricated reviews, Defendant falsely used the names of prior customers of Plaintiff and posted a detailed and denigratory assessment of Plaintiff that encouraged potential customers to avoid contracting with Plaintiff. In pertinent part, the first two reviews stated:

> Grade: F. Dealing with these people was the single biggest mistake I have ever made in my whole life. I[t] was a miserable experience and the job was done so poorly we decided to sell the house. They were great salesman [sic] but their workman [sic] were idiots and the owner was not willing to help in any way.... I was so happy just to get them out of my life I paid them much more than I should have because their law firm threatened to lien my house if I disagree[d] with any part of their bill.... All I can say is ... if they show up in your front yard in the middle of the night after your house catchs [sic] on fire, RUN! Do yourself a favor and call your insurance company and get a referal [sic] for legitimate business people.

Additionally, on April 8, 2008, Defendant posted another derogatory review on Google, this time anonymously outlining Plaintiff's allegedly untrustworthy business practices and poor customer service. Just like his first two reviews, Defendant wrote his third fabricated review from the perspective of an unhappy former customer and gave a detailed negative assessment of Plaintiff's business practices. The third review stated, *inter alia:*

> They were a pain in the neck when I least needed one! Like the other guy[,] The Fire Works Restoration Company showed up in the middle of the night while the firemen where [sic] still putting out the fire.... Their emergency board up guys were great.... I liked them so much I decided maybe they weren't so bad when a salesman from the Fire Works Restoration Company showed up the next day.... Then they offered to do a "Free Estimate." ... So [F]ire [W]orks was a lot higher than the other company. [T]hey got into a long drawn out fight about 1) the cost to remove the water and 2) the cost to dry out the house and 3) the cost to rebuild the house and 4) the cost to clean our stuff. The whole thing turned out to be such a nightmare that I figured it was just easier to deal with the insurance company contractor (the one these guys told me was gonna rip me off!!!!). [S]o when I told them I was not going with them then they sent me a bill even bigger than the first that the insurance company already said they didn't want to pay. [T]he [F]ire [W]orks guy said it was a "supplement" and the first bill was not complete. [T]hey wanted an additional $1,700 more than the first bill (which was already too high!!!). Moral of the story——people that seem nice usually are nice ... but not always.

Following its discovery of the reviews, Plaintiff brought a "John Doe" lawsuit to ascertain the identity of the poster of the fabricated reviews. On June 20, 2008, Yahoo identified Defendant as the person who posted the review on its website. On July 1, 2008, Defendant e-mailed Mitchell, admitting he was the author of the defamatory reviews and indicating he regretted posting them in his effort to hurt Mitchell,

by and through Plaintiff. The review on Yahoo remained active and visible for approximately two months after its initial posting and before its removal. The two Google reviews remained active and visible for nearly two years before their removal.

Plaintiff subsequently brought a defamation suit against Defendant, individually, and Defendant's businesses, BoardUp, 1–800 BoardUp of St. Louis, LLC, and Critical Path Restoration, LLC. In response, Defendant filed a counterclaim alleging defamation against Mitchell. Following trial, the jury found in Plaintiff's favor on its defamation claim against Defendant, individually, and awarded Plaintiff $1 in actual damages and $150,000 in punitive damages. In addition, the jury rejected both Plaintiff's defamation claim against BoardUp and Defendant's counterclaim against Mitchell.[1] Plaintiff then filed a motion for additur and Defendant moved for judgment notwithstanding the verdict ("JNOV") or, in the alternative, remittitur. The trial court denied both motions and Defendant now appeals.

## II. DISCUSSION

### Point I: Plaintiff Adduced Sufficient Evidence of Reputational Harm.

In his first point on appeal, Defendant argues the trial court erred in denying his motion for JNOV because Plaintiff failed to prove actual damages. Specifically, Defendant alleges the verdict was against the weight of the evidence because Plaintiff's evidence was insufficient to demonstrate damage to its reputation. We disagree.

### Standard of Review

 We review the trial court's denial of a JNOV motion to determine whether the plaintiff has made a submissible case.

*Johnson v. Allstate Indem. Co.,* 278 S.W.3d 228, 235 (Mo.App. E.D.2009). "To make a submissible case, a plaintiff must present substantial evidence that tends to prove the facts essential to plaintiff's recovery." *Kelly v. Bass Pro Outdoor World, LLC,* 245 S.W.3d 841, 847 (Mo.App. E.D.2007) (quoting *Kelly v. State Farm Mut. Auto. Ins. Co.,* 218 S.W.3d 517, 520–21 (Mo.App. W.D.2007)). Substantial evidence is evidence which, if true, has probative force upon the issues, and from which the jury can reasonably decide the case. *Hayes v. Price,* 313 S.W.3d 645, 650 (Mo. banc 2010). We view the evidence in the light most favorable to the verdict, giving the prevailing party all reasonable inferences from the verdict and disregarding the unfavorable evidence. *Johnson,* 278 S.W.3d at 235. We will not disturb the jury's verdict unless there is "a complete absence of probative facts to support the verdict." *Payne v. Cornhusker Motor Lines, Inc.,* 177 S.W.3d 820, 832 (Mo.App. E.D.2005).

 In order to prove defamation, a plaintiff must prove: "1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation." *Johnson,* 278 S.W.3d at 235 (quoting *State ex rel. BP Products N. Am. Inc. v. Ross,* 163 S.W.3d 922, 929 (Mo. banc 2005)). Proof of actual harm to the plaintiff's reputation is an absolute prerequisite in a defamation action. *Kenney v. Wal–Mart Stores, Inc.,* 100 S.W.3d 809, 817 (Mo. banc 2003). The evidence proffered to establish actual damages may not be too speculative and must be founded upon more than the plaintiff's embarrassment or perception of their own reputation. *Id.*

---

1. At the conclusion of Plaintiff's evidence, Plaintiff dismissed with prejudice defendants

1–800 BoardUp of St. Louis, LLC and Critical Path Restoration, LLC.

(quoting *Bauer v. Ribaudo*, 975 S.W.2d 180, 183 (Mo.App.E.D.1997)): *see also William L. Prosser, The Law of Torts*, § 111, at 737 (4th ed. 1971) ("Defamation is not concerned with the plaintiff's own humiliation . . . .").

Viewing the evidence in the light most favorable to the verdict and disregarding contrary evidence, we find the jury was presented with ample evidence to support an award of actual damage based upon the reputational damage Plaintiff suffered as a result of Defendant's defamatory web reviews. First to testify at trial was Mitchell, owner and operator of Plaintiff. Mitchell testified to the lengthy personal and working relationship he had with Hosto and how their relationship disintegrated during contentious litigation regarding the future of the two companies they cooperatively maintained. Mitchell further testified that prior to Defendant's disparaging web reviews, Plaintiff enjoyed a good reputation in the restoration industry. After the reviews were posted, Mitchell contended the company's reputation was damaged. To assist in quantifying this claim, Mitchell introduced financial records intended to link Defendant's posting of the web reviews with Plaintiff's subsequent loss of business.

Along with Mitchell's testimony, other witnesses connected to the restoration business testified as to the adverse impact Defendant's reviews would have on a company. Frederick Sussman ("Sussman"), an independent contractor and business consultant, testified about the significant role the internet plays in the success of today's businesses. As consumers increasingly rely upon the internet as their gateway to commerce, Sussman noted there has been a concomitant increase in the typical consumer's dependence on online reviews when assessing a company or product. If the web reviews are negative, Sussman continued, it is likely that the customer will simply pass on that particular company without further investigation. With that in mind, Sussman testified that Defendant's fabricated reviews likely damaged Plaintiff's reputation by both deterring potential customers and falsely painting Plaintiff's work in a negative light.

Next to testify was Bradley Weston ("Weston"), president of an area restoration company. He testified about the tight-knit nature of the restoration business community in the St. Louis area and how Plaintiff had a positive reputation in the time preceding the web reviews.[2] Weston stated that although the web review had no impact on his personal impression of Plaintiff, he noted that such negative reviews certainly would damage a company's reputation.

Shawn Khalil ("Khalil"), a former employee of Plaintiff and entrepreneur in the restoration business, reiterated much of Weston's testimony regarding the relatively small size of the local restoration business community. Khalil described how he discovered the negative reviews while utilizing the Google search engine in the spring of 2008 and how he immediately notified Plaintiff of his find. Although Khalil made clear that he did not think less of Plaintiff, he opined that, based upon his more than 15 years in the restoration business, the negative reviews were likely to be damaging to Plaintiff's reputation and he believed that Plaintiff's reputation started to diminish sometime in 2007 or 2008.

In reply, Defendant argues that the only evidence offered by Plaintiff was from persons who admitted Plaintiff's reputation was not diminished in their eyes. Fur-

---

**2.** Weston's deposition was read into the record by Plaintiff's counsel.

thermore, Defendant contends that the testimony of Plaintiff's witnesses was too speculative to stand as proof of actual damage to Plaintiff's reputation. To support his argument, Defendant directs this Court's attention to three cases in which the respective plaintiffs were unable to show actual damage to reputation. This argument lacks merit and we find Defendant's cases not applicable to the facts in this case.

In *Kenney v. Wal–Mart Stores, Inc.*, 100 S.W.3d 809 (Mo. banc 2003), the Missouri Supreme Court directly addressed the issue of what suffices as proof of actual damages in a defamation suit. In its analysis, the Kenney Court first looked back to the Western District's decision in *Bauer v. Ribaudo*, 975 S.W.2d 180 (Mo.App.W.D. 1997). *Kenney*, 100 S.W.3d at 815. In *Bauer*, the plaintiff, Tom Bauer, a candidate for state representative, alleged a political television advertisement defamed him. *Id.* (citing *Bauer*, 975 S.W.2d at 181). However, as the Western District noted, although Mr. Bauer complained the alleged defamatory statement led to "people refus[ing] his ballot and [making] crude remarks," he was unable to name one person who changed his or her vote as a result. *Id.* (quoting *Bauer*, 975 S.W.2d at 182). Moreover, Mr. Bauer failed to present any evidence of his standing in the polls prior to or after the airing of the political advertisement. *Id.* (citing *Bauer*, 975 S.W.2d at 182). Based on that evidence, the Western District found Mr. Bauer did not prove actual damages in his defamation suit because his evidence was "too speculative." *Id.* (quoting *Bauer*, 975 S.W.2d at 183).

Next, the *Kenney* Court, evaluated this Court's findings in *Taylor v. Chapman*, 927 S.W.2d 542 (Mo.App. E.D.1996). *Id.* at 815–16. In *Taylor*, this Court held that the plaintiff, Ingrid Taylor, failed to prove actual damages in a defamation suit. *Id.* at 816 (citing *Taylor*, 927 S.W.2d at 544). This Court noted that while Ms. Taylor "stated her integrity had been tarnished," she never provided support for that conclusion and proffered no testimony from others that her reputation had been damaged. *Id.* at 816 (citing *Taylor*, 927 S.W.2d at 544). Further, Ms. Taylor introduced no evidence supporting any damage to her physical or mental health and she admitted she was unable to even differentiate between the damages attributable to one person's allegedly slanderous statements and the damages attributable to another person's allegedly libelous letter. *Id.* at 816 (citing *Taylor*, 927 S.W.2d at 544). As such, this Court held Ms. Taylor could not recover. *Id.* at 816 (citing *Taylor*, 927 S.W.2d at 544).

Lastly, the *Kenney* Court approvingly cited persuasive authority from other jurisdictions in order to broaden its analysis of what constitutes actual damages when looking at injury to reputation. The Court pointed out that "[i]njury to reputation . . . defies measurement." *Id.* (quoting *Rocci v. MacDonald–Cartier*, 323 N.J.Super. 18, 731 A.2d 1205, 1208 (N.J.Super.Ct.App.Div.1999)). Because of that, "a plaintiff should offer some concrete proof that his reputation has been injured. . . . Testimony of third parties as to a diminished reputation will also suffice to prove 'actual injury.' Awards based on a plaintiff's testimony alone or on "inferred" damages are unacceptable." *Id.* (quoting *Rocci v. MacDonald–Cartier*, 731 A.2d at 1208); *see also Jenkins v. Liberty Newspapers Ltd. P'ship*, 89 Hawai'i 254, 971 P.2d 1089, 1103 (1999) (finding no proof of actual damages when no evidence presented pertaining to lost income, expenses to mitigate or correct the statement, or testimony that anyone thought less of the plaintiff).

In line with its detailed analysis, the *Kenney* Court similarly found that the plaintiff in its case, Carolyn Kenney, was unable to prove actual damage to her reputation. *Kenney*, 100 S.W.3d. at 817–18. Ms. Kenney alleged that she felt "embarrassed, shocked, [and] mad," but her conclusory statements as to her personal feelings were the extent of her proof. *Id.* at 817. Ms. Kenney was unable to name a single person who held her in lower regard. *Id.* Nor was she able to present anyone who thought her reputation had been damaged or personally thought less of her as a result of the defendant's actions. *Id.* Likewise, Ms. Kenney was unable to offer any quantifiable evidence of her alleged injury. *Id.* at 818. Thus, the *Kenney* Court held Ms. Kenney could not recover. *Id.*

■ Here, particularly when contrasted with the plaintiffs at issue in *Kenney* and the cases cited therein, Plaintiff adduced sufficient evidence of reputational harm. Unlike *Bauer*, *Taylor*, and *Kenney*, the jury in this case was not merely presented with testimony from the defamed Plaintiff. Instead, witnesses in the same industry as Plaintiff, whether they found the reviews independently or were presented with them later, testified that the derogatory online reviews were almost certain to damage Plaintiff's reputation.[3] *See Kenney*, 100 S.W.3d at 816 (While a plaintiff's testimony alone is inadequate, "testimony of third parties as to a diminished reputation will . . . suffice to prove 'actual injury.' "). Additionally, in order to both quantify and

further bolster its claim of actual reputational harm, Plaintiff adduced substantial and competent evidence pertaining to its pecuniary losses that followed Defendant's posting of the negative reviews.

■ Ultimately, "[t]he question of whether [a plaintiff's] damages were caused by the defamatory statement [is] for the jury to decide." *Johnson*, 278 S.W.3d at 236 (quoting *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 71 (Mo. banc 2000)). Based upon the foregoing testimony, we find there was competent and substantial evidence presented to support the jury's award of actual damages to Plaintiff. Point one is denied.

### Point II: The Trial Court Did Not Err in Overruling Defendant's Motion for JNOV.

In Defendant's second point, he argues the trial court erred in denying his motion for JNOV because the jury essentially awarded nominal damages, and nominal damages are not allowed in defamation cases. This argument is without merit.

The principal thrust of Defendant's second point is that the jury's $1 award for actual damages was truly an award for nominal damages. In order to arrive at that conclusion, Defendant theorizes what the jury was thinking and then postulates the jury's motive underlying its award. According to Defendant, the jury recognized that Plaintiff failed to prove actual damages. However, spurred by a motivation to punish Defendant for posting the

---

**3.** We reject Defendant's contention that Plaintiff needed to produce testimony from potential customers who opted to turn elsewhere due to the web reviews. With the internet, consumers are able to compare businesses and their wares with unprecedented speed. Interpersonal contact is characteristically absent, so if a consumer declines to engage a business it encounters on the internet, that consumer continues his or her

search and the business has no knowledge it has been passed by. As such, it would be unreasonably burdensome to impose upon a business plaintiff the requirement that it locate potential customers that it never knew in order to successfully demonstrate actual damage to its reputation. The deleterious impact of such a constraint far outweighs any benefits it would have in proving reputational harm.

web reviews, Defendant claims the jury assessed $1 in actual damages so that punitive damages could be awarded. Thus, Defendant maintains, the jury's $1 award was essentially in the nature of nominal damages and invalid under Missouri law.

Defendant builds this speculation upon the framework of his earlier argument, i.e., Plaintiff failed to present substantial evidence of actual damages. Yet, as discussed in Defendant's first point, we find that Plaintiff did in fact put on substantial evidence of actual damage, both pecuniary and reputational.

 Moreover, we decline to hypothesize about the jury's reasoning. *Children Int'l v. Ammon Painting Co.*, 215 S.W.3d 194, 200 (Mo.App. W.D.2006). Although we find Defendant's contention to be possible, it is far from certain. "Reviewing courts examine what the jury found, not the possible or even probable reasoning it used. '[W]e may not speculate upon what a jury meant by what it said.'" *Sterbenz v. Kansas City Power and Light Co.*, 333 S.W.3d 1, 12 (Mo.App. W.D.2010) (quoting *Children Int'l* 215 S.W.3d at 200). Defendant's second point is denied.

### Point III: The Trial Court Did Not Err in Overruling Defendant's Motion for JNOV.

Defendant's third point on appeal effectively reiterates his second point. The only functional difference being that Defendant's third point argues that because the jury awarded what he characterizes as nominal damages, the punitive damages award cannot stand. For the aforementioned reasons, Defendant's argument is without merit. Point denied.

### Point IV: The Punitive Damages Award Comports with Due Process.

In Defendant's fourth point, he argues the trial court erred in denying his motion for remittitur because the $150,000 judgment for punitive damages was grossly excessive in light of the $1 of actual damages awarded. Such disproportion between the actual damages and punitive damages, Defendant asserts, is violative of his due process rights under both the Fourteenth Amendment of the Constitution of the United States and Article I, section 10 of the Missouri Constitution. We disagree.

 Imposing punitive damages requires that a proper balance be struck. The award must be enough to ensure that the tortfeasor is adequately punished and deterred from future similar conduct; yet, the award must not be grossly excessive. *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). To the extent an award is grossly excessive, it violates the defendant's due process rights because it furthers no legitimate purpose and constitutes an arbitrary deprivation of property. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 417–18, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *see also Gore,* 517 U.S. at 574, 116 S.Ct. 1589 ("Elementary notions of fairness ... dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."). Appellate review ensures that an award of punitive damages is based upon "an application of law, rather than a decisionmaker's caprice." *Campbell,* 538 U.S. at 418, 123 S.Ct. 1513 (quoting *Gore,* 517 U.S. at 587, 116 S.Ct. 1589 (Breyer, J., concurring)). Accordingly, this Court reviews a constitutional challenge to a punitive damages award *de novo. Hodges v. City of St. Louis,* 217 S.W.3d 278, 279 (Mo. banc 2007).

 When evaluating whether a punitive damages award comports with due process, our analysis will take into account the peculiar facts and circum-

stances of the defendant's conduct and the resulting harm to the plaintiff. *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. We will consider: (1) the reprehensibility of the defendant's conduct; (2) disparity between the actual harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *Id.* at 418, 123 S.Ct. 1513. While few awards that exceed a single-digit ratio between punitive and compensatory damages will satisfy due process, greater ratios may "comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *Id.* at 425, 123 S.Ct. 1513 (quoting *Gore,* 517 U.S. at 582, 116 S.Ct. 1589); *Estate of Overbey v. Chad Franklin Nat. Auto Sales N., LLC,* 361 S.W.3d 364, 372–74 (Mo. banc 2012). In making that determination, the most important consideration is the degree of reprehensibility. *Gore,* 517 U.S. at 575, 116 S.Ct. 1589.

Assessing reprehensibility requires consideration of whether: (1) the harm was physical as opposed to economic; (2) the conduct evinced indifference to health or safety of others; (3) the target of the conduct was financially vulnerable; (4) the conduct involved repeated actions or was an isolated incident; or (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Campbell,* 538 U.S. at 419, 123 S.Ct. 1513 (citing *Gore,* 517 U.S. at 576–77, 116 S.Ct. 1589). "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

Applying the foregoing factors to the facts of this case, we find the amount of punitive damages was reasonable and did not violate due process. The actual damage award in this case of $1 was very small. As a result, adherence to a single-digit ratio would have been patently insufficient to adequately deter and punish Defendant for his conduct. *See Gore,* 517 U.S. at 568, 116 S.Ct. 1589. As the Missouri Supreme Court noted in *Estate of Overbey,* this rationale is supported by the language of Section 510.265 RSMo Cum. Supp.2008, which codifies a cap to punitive damage awards.

> [T]he ratio of punitive damages should not be more than five times actual damages in cases with damages of more than $100,000, but if the amount of actual damages was less than $100,000, then it authorized an award of up to $500,000 regardless of the size of the actual damage verdict.

*Estate of Overbey,* 361 S.W.3d at 373 (citing Section 510.265). Though this statute does not serve to permit an excessive punitive damage award, it is an additional indicator that due process does not prevent larger ratios in the case of small awards, if such an award is necessary given the facts of the case. *Id.*

Here, Defendant's repeated conduct harmed Plaintiff and was the result of Defendant's intentional malice, trickery, and deceit. From the outset, Defendant's conduct evinced a calculated desire to seriously damage Plaintiff's business reputation and, in doing so, deliver, in Defendant's words, "the knock-[out] punch [he] had looked forward to delivering for so long." Defendant admitted that he was "bitter and wanted revenge." As an experienced member of the restoration industry and the site administrator for a popular industry internet forum, Defendant was mindful of the great importance a business places in its reputation and the significant role the internet plays in that regard. Nevertheless, Defendant utilized that knowledge to craft his plan and assail Plaintiff's reputation by fabricating and publishing critical web reviews on two popular search engines. Even after having

time to consider his actions, Defendant did not cease his conduct. Instead, he testified that he went online to post an additional fictitious review because he "felt something satisfying in" posting the initial derogatory reviews. Not until he received notification of Plaintiff's suit did Defendant demonstrate any contrition, and even then his apologies were couched in a desire to forego litigation.

Our review of the reasonableness of a punitive damages award is not facilitated by any rigid benchmarks or bright line tests, but is instead guided by the peculiar facts and circumstances of the defendant's conduct and the resulting harm to the plaintiff. *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513. On this record, the jury was within its discretion in determining that "a particularly egregious act has resulted in only a small amount of economic damages," resulting in a proper deviation from the single-digit ratio, while remaining within the limits of due process. *Estate of Overbey*, 361 S.W.3d at *373–74; *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513 (quoting *Gore*, 517 U.S. at 582, 116 S.Ct. 1589).[4] Point four is denied.

### III. CONCLUSION

The judgment is affirmed.

CLIFFORD H. AHRENS, P.J., and GARY M. GAERTNER, JR., J., concur.

---

4. Numerous cases from Missouri and elsewhere have allowed punitive damage awards beyond the single-digit ratio when the actual damage award was small and the conduct was egregious. *See, e.g., Smith v. New Plaza Pontiac Co.*, 677 S.W.2d 941 (Mo.App. W.D. 1984) ($400 in actual and $30,000 in punitive damages); *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) ($19,000 in actual and $10 million in punitive damages); *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354 (11th Cir.2004) ($115 in compensatory and $250,000 in punitive damages); *Parrott v. Carr Chevrolet, Inc.*, 331 Or. 537, 17 P.3d 473 (2001) ($11,496 in compensatory and $1 million in punitive damages); *Abner v. Kansas City S.R.R.*, 513 F.3d 154 (5th Cir.2008) (nominal award of $1 and $125,000 in punitive damages); *JCB v. Union Planters Bank*, 539 F.3d 862 (8th Cir.2008) ($1 in compensatory and $108,750 in punitive damages).