David and Diana **HECKADON**,
Respondents,

v.

**CFS ENTERPRISES, INC.** and
**Chad Franklin, Appellants.**

No. WD 74288.

Missouri Court of Appeals,
Western District.

March 19, 2013.

Motion for Rehearing and/or Transfer
to Supreme Court Denied April
30, 2013.

Application for Transfer Denied
June 25, 2013.

**3.** Other parties or entities may need to be added on remand to satisfy the declaratory judgment.

Douglass F. Noland, Liberty, for Respondents.

Patric Linden, for Appellants.

Before Division One: THOMAS H. NEWTON, Presiding Judge, JOSEPH M. ELLIS, Judge and GARY D. WITT, Judge.

JOSEPH M. ELLIS, Judge.

Appellants CFS Enterprises, Inc. ("CFS") and Chad Franklin ("Franklin") appeal from a judgment entered by the Circuit Court of Clay County in favor of Respondents David and Diana Lynn Heckadon on Respondents' claims that Appellants violated the Missouri Merchandising Practices Act ("MMPA") by misrepresenting or omitting material facts about a vehicle Respondents purchased from Appellants. For the following reasons, the judgment is affirmed in part and reversed and remanded in part.

The evidence viewed in the light most favorable to the verdict reflects the following. Respondents wanted to purchase a more reliable vehicle with low monthly payments because they were living on a fixed income. In September of 2007, Respondents saw a television advertisement for CFS promising car payments as low as $43 a month. Respondents scheduled an appointment with CFS and drove to the dealership to discuss the advertisement.

Once there, CFS employees told Respondents that the deal described in the advertisement was real and that they could get low monthly payments of $43 by participating in CFS's promotional program. The promotional program, which would last up to four years, allowed Respondents to purchase a Suzuki vehicle, drive it for a certain period of time, return the vehicle to CFS, and select a new Suzuki vehicle. CFS employees told Respondents that their payments would remain $43 per month for the four-year promotional period. CFS employees further explained that they were offering the promotional program in order to ensure Appellants had low-mileage vehicles to sell on their used car lot.

Respondents decided to participate in the program and selected a vehicle ("the 2007 vehicle"). After filling out a credit

application, Respondents spoke with CFS's finance manager. The manager gave Respondents paperwork to sign, including a loan application. The manager told Respondents not to worry about the terms of the loan application because it was merely a formality. Respondents were subsequently approved for a loan. Respondents later received a check in the mail from CFS to cover the difference between the $43 per month payment they were promised and the amount that appeared on their monthly loan statement.[1]

In February of 2008, Respondents received a phone call from CFS informing them it was time to return the 2007 vehicle. Appellants faxed Respondents a new credit application, which Respondents filled out and faxed back to the dealership. Without Respondents' knowledge, Appellants changed the amount of monthly income Respondents listed on their credit application, increasing it by $2,000.

When Respondents returned the 2007 vehicle to CFS, they selected another Suzuki vehicle ("the 2008 vehicle"). In purchasing the 2008 vehicle, Respondents paid $1,112 for a warranty, $540 for gap insurance, and $499.95 for an administrative fee to participate in the promotional program. Respondents also paid $427.58 in Missouri sales tax as well as a fee of $5.50 to transfer their license plates. Respondents purchased the 2008 vehicle for $19,495. Respondents later discovered that the window sticker listed the price of the 2008 vehicle as $17,495; thus Appellants marked up the price of the 2008 vehicle by $2,000.

Appellants were approved for a loan on the 2008 vehicle. CFS's finance manager again told Respondents not to worry about the loan paperwork. Respondents subsequently received a $2,619 check from CFS to cover the portion of their monthly car payment that exceeded $43. Respondents' monthly statement from its lender showed Respondents owed $649.37 per month. Respondents made four payments to the lender on the 2008 vehicle.

In July, Respondents saw a news report indicating that CFS's promotional deal was a scam. Respondents called CFS to inquire about the news report and see if they could return the 2008 vehicle. CFS stated it did not know about any promotional program and suggested that if Respondents had a problem, Respondents should seek arbitration. Respondents, however, contacted an attorney, who told them to stop making payments on the 2008 vehicle. After the attorney negotiated a deal with the lender, Respondents surrendered the 2008 vehicle to the lender, and the lender forgave the loan. Respondents paid the attorney $200 to negotiate with the lender.

In December of 2009, Respondents filed a petition for damages against CFS, CFS's president and owner, Chad Franklin, and American Suzuki Motors Corporation ("ASMC").[2] The petition alleged five counts: (1) fraudulent misrepresentation, (2) MMPA violations, (3) negligent misrepresentation, (4) piercing the corporate veil, and (5) civil conspiracy. Respondents alleged all counts, except for the piercing the corporate veil claim, against CFS, Franklin, and ASMC. Respondents alleged the

---

1. Of the $1,609 check Respondents received from CFS, $300 was allocated to the purchase of gas, leaving $1,309 for making car payments. Respondents' monthly loan statement showed that Respondents owed $391.25 per month. Respondents made four payments to the lender, totaling $1,565.

2. ASMC is a distributor of new Suzuki motor vehicles to authorized dealers in Kansas and Missouri.

piercing the corporate veil claim solely against Franklin.

Prior to trial, Respondents entered into a confidential settlement agreement with ASMC. ASMC was subsequently dismissed from the suit, with prejudice. More facts regarding Respondents' settlement with ASMC will be discussed *infra* as needed.

On May 23, 2011, a bifurcated jury trial commenced against Appellants CFS and Franklin. Respondents as well as four other individuals testified to the misrepresentations Appellants made while selling them Suzuki vehicles. Respondents also introduced evidence from both the Missouri and Kansas attorney general regarding the number of complaints made against Appellants. Franklin also testified in both his individual capacity and capacity as a representative of CFS.

At the conclusion of the first stage, Respondents submitted only the MMPA claims to the jury. The jury returned verdicts in favor of Respondents and awarded $2,144.87 in actual damages against CFS and $2,144.87 in actual damages against Franklin. The jury also determined Respondents were entitled to punitive damages. In the second stage, the jury awarded $100,000 in punitive damages against CFS and $400,000 in punitive damages against Franklin. The trial court entered its judgment accordingly.

Respondents and Appellants both filed post-trial motions. Respondents filed a motion requesting the judgment be amended to include attorney's fees. Appellants filed two joint motions. Their first motion was to amend the judgment by (1) reducing the judgment by the amount of Respondents' settlement with ASMC pursuant to § 53.060 and (2) merging the awards of actual damages entered against CFS and Franklin. Appellants' second joint motion was a motion for remittitur or, in the alternative, a motion for new trial. The motion for remittitur asserted that the amount of punitive damages awarded was grossly excessive and, thereby, violated Appellants' constitutional due process rights under the Fourteenth Amendment. The court held a hearing on the post-trial motions and took them under advisement.

On August 15, 2011, the trial court entered its amended judgment, which awarded Respondents the attorney's fees they requested and denied Appellants' motions to amend the judgment and remit the punitive damages awards. Appellants now assert three points on appeal regarding the denial of their post-trial motions.[3]

In their first point, Appellants assert that the trial court erred by failing to amend its judgment to reduce the actual damages awards against Franklin and CFS in an amount equal to Respondents' prior settlement with ASMC because Appellants were entitled to a reduction under § 537.060. We review the denial of a motion to reduce a judgment pursuant to

---

**3.** Neither party addresses the issue of whether we have jurisdiction over this appeal since both the judgment and the record are silent regarding the other four counts of the petition, but we have a duty to do so *sua sponte. Melson v. Traxler*, 356 S.W.3d 264, 268 n. 9 (Mo.App. W.D.2011). We note that "theories of liability ... pleaded and proved but not submitted [to the jury] are abandoned." *Keller v. Int'l Harvester Corp.*, 648 S.W.2d 584, 590 (Mo.App. W.D.1983); *see also Young ex rel. Young v. Davis*, 726 S.W.2d 836, 838 (Mo.App. S.D.1987). By not submitting the other four causes of action to the jury, Respondents abandoned those theories of liability against Appellants. Therefore, the judgment is final and appealable. *See Unnerstall Contracting Co., Ltd. v. City of Salem*, 962 S.W.2d 1, 5–6 (Mo.App. S.D.1997); *Murray v. Ray*, 862 S.W.2d 931, 932 n. 1 (Mo.App. S.D. 1993).

§ 537.060 *de novo*.[4] *McGuire v. Kenoma, LLC*, 375 S.W.3d 157, 179 (Mo.App. W.D. 2012); *see also Gibson v. City of St. Louis*, 349 S.W.3d 460, 465 (Mo.App. E.D.2011).

Section 537.060 [5] provides, in pertinent part:

> When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, such agreement shall not discharge any of the other tort-feasors for the damage unless the terms of the agreement so provide; however such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater.

Thus, "[s]ection 537.060 permits a defendant's liability to be reduced by the amount of settlements with joint tortfeasors." *Sanders v. Ahmed*, 364 S.W.3d 195, 211 (Mo. banc 2012).

Reduction pursuant to § 537.060 must be pled and proven as an affirmative defense. *Id.* "The burden of proof is on the party seeking reduction." *Id.* at 213. The party seeking reduction, therefore, bears the burden of pleading and proving "1) the existence of a settlement and 2) the stipulated amount of the agreement or the amount in fact paid." *Id.* at 211–12.

Likewise, the party seeking reduction also "bears the burden of proving it had joint liability with the settling tortfeasor." *Stevenson*, 326 S.W.3d at 928. By its own terms, § 537.060 requires a showing that "two or more persons [are] liable in tort for the same injury." Application of § 537.060, therefore, is predicated upon a showing that joint tortfeasors are liable for the same injury.[6] *Id.* at 925. Thus, as the parties seeking reduction, Appellants bore the burden of proving they were jointly liable with ASMC for the same injury at issue in this case in addition to the burden of pleading and proving the

**4.** The parties disagree as to the proper standard of review in this case. Recently, we noted in *Wagner v. Bondex International, Inc.*, 368 S.W.3d 340, 359 n. 6 (Mo.App. W.D. 2012), that Missouri appellate courts have used the standard of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), when there are factual issues decided below regarding such factual matters as whether a certain payment was attributable to a settlement, or about the amount of a settlement payment. *See Stevenson v. Aquila Foreign Qualifications Corp.*, 326 S.W.3d 920, 925 (Mo.App. W.D. 2010) (finding that the *Murphy v. Carron* standard applied where there was dispute as to whether the predicate condition to application of § 537.060—"multiple tortfeasors being liable for the same injury—is established"). Because there were factual issues involved, we likewise applied the *Murphy v. Carron* standard in *Wagner*. *Wagner*, 368 S.W.3d at 359 n. 6. However, if there are no such factual disputes, the trial court rules as a matter of law, and appellate review is *de novo*. *Gibson*, 349 S.W.3d at 465. In this case, there is no indication that the trial court's decision was dependent upon factual determinations, and the arguments made by the parties on appeal address legal, as opposed to factual, issues. Thus, the appropriate standard of review is *de novo*.

**5.** All statutory citations are to RSMo 2000 unless otherwise noted.

**6.** In *Stevenson*, this court recognized two different situations in which joint liability for the same injury can be established for purposes of § 537.060. 326 S.W.3d at 925. Under the first scenario, "same injury" can result from a situation in which "the same transaction of facts causes an injury that is 'indivisible' with respect to the relative culpability of the multiple tortfeasors contributing to the same." *Id.* In the second instance, a "same injury" can occur "in the rare case where technically 'independent' torts occur under circumstances making it impossible to differentiate which injuries were caused by which defendants, rendering the tortfeasors joint and the injuries 'indivisible.'" *Id.*

existence and the amount of a settlement between Respondents and ASMC.

■ Here, Appellants satisfied their burden of pleading and proving a settlement existed. The record reflects that each Appellant asserted a right to a reduction pursuant to § 537.060 in their respective answer to Respondents' petition.[7] Furthermore, it is undisputed that Respondents and ASMC entered into a settlement. Respondents informed the court that the settlement was confidential and contained a confidentiality clause. The court ordered Respondents to produce the settlement, and they did so. The court then announced that since it was a confidential settlement, it would be held under seal and "can be raised anytime post-trial." Appellants, therefore, pleaded reduction as an affirmative defense and established that a settlement existed between ASMC and Respondents.

As noted, however, Appellants were required to prove not only the existence of the settlement, but "the stipulated amount of the agreement or the amount in fact paid." *Sanders*, 364 S.W.3d at 212. Appellants failed to satisfy this latter burden.

Consistent with the trial court's order that the reduction and settlement issue could be addressed post-trial, Appellants filed an after-trial joint motion to amend the judgment, which asserted that ASMC was a settling joint tortfeasor because Respondents alleged in their petition that ASMC's conduct caused the same injury and resulted in the same damages as Appellants' conduct in the matter. The trial court held a hearing on the motion. At that hearing, Appellants reiterated their arguments that ASMC was a joint tortfeasor that caused the same harm to Respondents as Appellants. However, Appellants presented no evidence whatsoever at the hearing on the motion. More specifically, Appellants wholly failed to introduce any evidence regarding the terms or amount of Respondents' settlement with ASMC or the amount actually paid.

■■ Appellants rely heavily upon the fact that the settlement agreement was filed with the court under seal. However, if Appellants wished to rely upon the

---

7. Each Appellant included the following in their respective answer to Respondents' petition for damages:

> If any judgment is entered against [Appellant] based upon the events and allegations stated in [Respondents'] Petition for Damages, that judgment must be reduced by either (1) the stipulated amount of any and all settlement agreements between [Respondents] and all other alleged Defendants and/or tortfeasors, or (2) the amount of consideration all other Defendants and alleged tortfeasors paid to [Respondents] for relief or discharge, whichever is greater, as provided in Section 537.060, RSMo 2000.

In *Delacroix v. Doncasters, Inc.*, No. ED97375, 2013 WL 150240, at *17 (Mo.App. E.D. Jan. 15, 2013), the Eastern District recently found such "allegations amount to legal conclusions that fail to allege any facts regarding the applicable settlement giving rise to [the defendant's] affirmative defense." Thus the court concluded that the defendant failed to adequately raise the affirmative defense of reduction, as a matter of law, because "[a] pleading that makes a conclusory statement and does not plead the specific facts required to support the affirmative defense fails to adequately raise the affirmative defense." *Id.* (internal quotation omitted). However, unlike the settlement in *Delacroix*, which occurred prior to the defendant filing its answer, the settlement between Respondents and ASMC occurred long after Appellants filed their respective answers to Respondents' petition. Thus, such pleadings were sufficient to allege the affirmative defense of reduction pursuant to § 537.060 at the time Appellants' filed their answers. *See McGuire*, 375 S.W.3d at 181 & n. 18 (finding that similar conclusory statements made in the defendant's pleadings were sufficient for purposes of § 537.060 because it would be impossible for the defendant to plead specific facts in its answer regarding a settlement that had not yet occurred).

sealed settlement agreement as proof of the settlement and its applicability to the present case, then they "should have offered it into evidence" at the hearing on the motion or "asked the circuit court to take judicial notice of it." *In re Foreclosures of Liens for Delinquent Land Taxes by Action in rem Collector of Revenue,* 334 S.W.3d 444, 449–50 (Mo. banc.2011). "The circuit court is not required to leaf through a file to determine what should be used as evidence when making its decision." *Id.* at 450. Furthermore, "[s]imply filing a document with the trial court does not put it before the court as evidence." *In re Adoption of C.M.B.R.,* 332 S.W.3d 793, 814 n. 16 (Mo. banc 2011) (internal quotation omitted); *see also Kauffman v. Kauffman,* 101 S.W.3d 35, 52 (Mo.App. W.D.2003) (explaining that "the mere filing of a document does not put it into evidence"). Thus, the fact that the settlement agreement was in the court file under seal did not relieve Appellants of their burden of proving the amount of the settlement, nor did it constitute proof of the amount.

In their reply brief, Appellants cite *Sanders* for the proposition that "a rebuttable presumption of joint liability for the same injury or wrongful death can arise from the plaintiff's pleadings and ensuing settlement." 364 S.W.3d at 213. They contend this shifted the burden to plaintiffs "to show that the injuries [were] divisible," *id.,* and that plaintiffs failed to meet that burden. As noted by the Court in *Sanders,* however, "[g]iven the existence of that presumption, the burden still falls to the [parties seeking reduction] to plead and prove the existence and applicability of the settlement and the amount paid thereunder." *Id.* Thus, assuming for the sake of argument that Appellants sufficiently established the existence of the settlement, and that ASMC had joint liability with Appellants for Respondents' injuries, it was still incumbent upon Appellants to

prove the amount of the settlement or the actual amount paid. This they failed to do.

The trial court, therefore, did not err in denying Appellants' motion to amend the judgment by reducing the award of damages against Appellants by the amount of the settlement between ASMC and Respondents. Point denied.

In their second point, Appellants contend that the trial court erred by refusing to merge the judgments awarded against CFS and Franklin because, absent such merger, Respondents will receive a double recovery. In support of their contention, Appellants assert that the evidence presented at trial did not delineate or differentiate between the harm attributable to CFS and the harm attributable to Franklin. They further rely on the fact that Respondents submitted the identical damage instruction to the jury for each Appellant. Appellants argue, therefore, that the actual damage awards entered against CFS and Franklin must be merged because they constitute awards for the same damages.

■ "[I]n reviewing the trial court's ruling on a motion to amend the judgment, we will not reverse the trial court unless it abused its discretion." *Norfolk S. Ry. Co. v. Crown Power & Equip.,* 385 S.W.3d 445, 452 (Mo.App. W.D.2012). "A circuit court abuses its discretion when its ruling shocks the sense of justice, shows a lack of consideration, and is obviously against the logic of the circumstances." *Id.* "If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion." *Id.* (internal quotation omitted).

■ The doctrine of merger "prevent[s] a party from being compensated twice for the same injury." *Horizon Memorial Grp., L.L.C. v. Bailey,* 280 S.W.3d

657, 666 (Mo.App. W.D.2009). Although "a single transaction may invade more than one right[,] and a plaintiff is entitled to proceed on numerous theories of recovery, he is not allowed to be made more than whole or receive more than one full recovery for the same harm." *Id.* "[A] plaintiff must establish a separate injury on each theory" presented at trial. *BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 197 (Mo. App. E.D.2007) (internal quotation omitted). Thus, "[i]f the damages asserted in two causes of action are the same, the damage awards should be merged." *Id.*

Here, Respondents submitted the same benefit-of-the-bargain damage instruction with respect to each Appellant:

> If you find in favor of the Plaintiffs David Heckadon and Diana Lynn Heckadon against [Defendant][8], then you must award Plaintiffs such sum as you believe was the difference between the actual value of the 2008 Suzuki motor vehicle the on date [sic] it was sold to Plaintiffs and what its value would have been on that date had the 2008 Suzuki motor vehicle been as represented by Defendant, plus such sum as you believe will fairly and justly compensate Plaintiffs for any other damages Plaintiffs sustained as a direct result of the occurrence submitted in the evidence.

Both instructions instructed the jury to assess the difference between the actual value of the 2008 vehicle on the date it was sold to Respondents and what the value of the 2008 vehicle would have been had it been as represented by Appellants. Thus, the damages requested with respect to the two MMPA claims were the same.

Respondents contend that the awards do not constitute the same damages because they requested the jury to assess the harm resulting from each Appellant's conduct with respect to the 2008 vehicle. Respondents' contention, however, does not change the fact that they failed to establish a separate injury with respect to each MMPA claim. Rather, each instruction requested the jury to assess the damages flowing from the same injury—the misrepresentations regarding the purchase of the 2008 vehicle and Appellants' profit therefrom. Accordingly, the actual damage awards of $2,144.87 entered against each Appellant must be merged to prevent Respondents from recovering twice for the misrepresentations made regarding their purchase of the 2008 vehicle.[9] Thus, we reverse the judgment and remand the case to the trial court to enter an amended judgment merging the actual damage awards against CFS and Franklin into a single award of $2,144.87. Point granted.

In their third point, Appellants contend that the trial court erred in denying their joint motion for remittitur because the punitive damages awarded to Respondents were excessive and thereby violated Appellants' due process rights un-

---

8. In lieu of the word "[Defendant]" we inserted above, the instruction pertaining to CFS stated "Defendant CFS Enterprises, Inc.," and the instruction pertaining to Franklin stated "Defendant Chad Franklin."

9. The merger of the actual damage awards does not affect the punitive damage awards against Appellants. Generally, "there can be no award of punitive damages absent an award of actual damages." *Taylor v. Compere*, 230 S.W.3d 606, 611 (Mo.App. S.D.

2007) (internal quotation omitted). However, "punitive damages are to be assessed against each tortfeasor depending, among other factors, upon his degree of culpability." *Id.* (internal quotation omitted). Therefore, even though the actual damage awards against Franklin and CFS are to be merged into a single award, punitive damages can still be assessed against both CFS and Franklin based upon their individual degree of culpability in the matter.

der the Fourteenth Amendment to the United States Constitution. We "review the trial court's determination of the constitutionality of the punitive award *de novo*, deferring to the trial court's findings of fact, unless they are clearly erroneous." *Krysa v. Payne*, 176 S.W.3d 150, 156 (Mo. App. W.D.2005).

"The decision to punish a tortfeasor through an award of punitive damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment." *Id.* at 155 (internal quotation omitted). "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* at 156 (internal quotation omitted). A grossly excessive punitive damage award, therefore, violates a tortfeasor's substantive right of due process in that "it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 372 (Mo. banc 2012) (internal quotation omitted).

No precise constitutional line or simple mathematical formula exists with regard to determining whether a punitive damages award is grossly excessive. *Krysa*, 176 S.W.3d at 156. Rather, the imposition of punitive damages requires a proper balance be struck between the need for punishment to deter future misconduct and the severity of the award. *The Fireworks Restoration Co., LLC v. Hosto*, 371 S.W.3d 83, 91 (Mo.App. E.D.2012) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). Accordingly, the United States Supreme Court instructed courts reviewing an award of punitive damages to consider three factors in determining whether a punitive damages award is grossly exces-

sive: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 1520, 155 L.Ed.2d 585 (2003); *see also Estate of Overbey*, 361 S.W.3d at 372.

We first consider the reprehensibility of Appellants' actions. The reprehensibility of defendant's conduct is the most important consideration in determining the reasonableness of a punitive damages award. *Krysa*, 176 S.W.3d at 156. In assessing the reprehensibility of a defendant's misconduct, we consider whether:

> (1) the harm was physical as opposed to economic; (2) the conduct evinced indifference to health or safety of others; (3) the target of the conduct was financially vulnerable; (4) the conduct involved repeated actions or was an isolated incident; or (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Hosto*, 371 S.W.3d at 92.

Appellants attempt to minimize the reprehensibility of their conduct by emphasizing that their misrepresentations did not evince any indifference toward the health and safety of others and resulted only in economic harm to Respondents. While Appellants' conduct did result primarily in economic, as opposed to physical, harm that does not negate the fact that the evidence establishes Appellants used trickery and deceit to target Respondents, Respondents were financially vulnerable, and

Appellants repeatedly engaged in such misconduct.

The evidence, viewed in the light most favorable to the verdict, indicates that Appellants used deceptive and misleading advertisements to induce Respondents to participate in their four-year car program. It can be inferred from Franklin's testimony that he knew the advertisements, which he approved, were misleading to consumers. Furthermore, CFS employees told Respondents that car payments would remain $43 a month for the four-year period and instructed them to pay no attention to the terms of the loan agreement, as it was merely a formality. Appellants altered Respondents' credit application to reflect a higher monthly income. Appellants also listed the 2008 vehicle's base price on the installment contract as $2,000 more than the sticker price. When Respondents heard news reports questioning the validity of Appellants' program and called the dealership to inquire, Appellants claimed not to know what program Respondents were referencing. Thus, Respondents' harm resulted from the trickery and deceit Appellants used to sell Respondents the 2008 vehicle.

The evidence likewise indicates that Respondents were financially vulnerable. David has multiple sclerosis, and Diana lost her job after company she worked for went out of business in 2001. Respondents' monthly income consists primarily of David's disability benefits. Respondents testified that they needed low monthly car payments because they were living on a fixed income. They further testified that they participated in the program to obtain the low monthly car payments. The evidence, therefore, establishes Respondents were financially vulnerable at the time they agreed to participate in Appellants' promotional program.

Furthermore, despite Appellants' contentions to the contrary, the record establishes that Appellants engaged in repeated misconduct with respect to their advertisements and promotional program. Four witnesses testified that Appellants made misrepresentations similar to those made to Respondents when they purchased Suzuki vehicles from Appellants. Evidence was also presented at trial showing that over 400 consumers have filed complaints against Appellants with either the Kansas or Missouri attorney general with regard to Appellants' promotional program and advertisements.

Appellants assert, however, that such evidence cannot be used to support the reprehensibility of their conduct. They contend that the repeated conduct factor "concerns whether there has been recidivism," which, in essence, required Respondents to establish that Appellants continued "to engage in misconduct after having been accused and found responsible [for] prior misconduct." Appellants base their recidivism argument upon *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 1520, 155 L.Ed.2d 585 (2003), and *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 797 (8th Cir.2004). These cases, however, stand for the proposition that although "evidence of other acts need not be identical to have relevance in the calculation of punitive damages," *State Farm*, 538 U.S. at 423, 123 S.Ct. at 1523, "the recidivist conduct must be factually as well as legally similar to the plaintiff's claim." *Williams*, 378 F.3d at 797. Appellants do not challenge the relevancy of evidence on the basis of its similarity to Respondents' claim; rather, they challenge the evidence only on the basis that it "does not support a conclusion that CFS or Franklin continued to engage in misconduct after being advised that their conduct was improp-

er." [10] Such is not the standard for introducing evidence of repeated conduct for purposes of assessing a punitive damages award. Thus the evidence establishes that Appellants engaged in repeated misconduct with respect to its promotional program and advertisements.

In sum, the harm actually sustained by Respondents in this case was economic and did not evince any indifference to health or safety of others. Nevertheless, Appellants' repeated use of trickery and deceit to sell Suzuki vehicles to financially vulnerable targets such as Respondents constituted reprehensible conduct, the degree of which, as discussed *infra*, was sufficient to justify the amount of punitive damages awarded against Appellants.

We now consider the disparity between the actual harm suffered by Respondents and the punitive damages award. Appellants contend that the ratio of punitive damages to actual damages is impermissibly high because "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 426, 123 S.Ct. at 1524.

Here, the jury awarded Respondents actual damages of $2,144.87 against both Appellants. The jury then assessed a punitive damages award of $100,000 against CFS and a punitive damages award of $400,000 against Franklin. Thus, the ratio of actual to punitive damages with respect to CFS was approximately 47:1. The ratio of actual to punitive damages with respect to Franklin was approximately 187:1. But that disparity, in and of itself, does not make the punitive damages award inherently excessive.

Courts "have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *Id.* Rather, "the precise award in any case must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Estate of Overbey*, 361 S.W.3d at 373 (internal quotation omitted). The Missouri Supreme Court has indicated that deviation from the single-digit ratio of actual to punitive damages "may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *Id.* (internal quotation omitted). More particularly, in *Estate of Overbey*, the Missouri Supreme Court upheld a punitive damage award of $500,000 against Franklin for deceptive conduct similar to that at issue in this case despite the fact that the actual damages awarded against him in *Estate of Overbey* were only $4,500, resulting in a 111:1 ratio between actual and punitive damages. *See id.* at 373–74.

Here, the facts and circumstances of this case support the jury's deviation from the single-digit ratio between actual and punitive damages. This case presents a situation in which Appellants used trickery and deceit to misrepresent the terms of a promotional program that targeted financially vulnerable individuals. That same misconduct affected numerous people throughout the Kansas City metropolitan area. Fur-

10. To this end, the record does suggest Appellants had knowledge their conduct was improper prior to their interaction with Respondents. At trial, Respondents introduced a letter dated June of 2007 from American Suzuki Financial Services regarding certain loans Appellants had issued. The letter indicated that American Suzuki had received complaints and questions regarding the content and misleading nature of Appellants' advertisements. The letter demanded Appellants to buy back several loans that had been assigned to American Suzuki. Respondents purchased their first vehicle from Appellants in September of 2007. The record, therefore, indicates that Appellants had knowledge their advertising and promotional program were improper prior to the misrepresentations that form the basis of Respondents' MMPA cause of action.

thermore, Franklin, who took the stand in both his individual capacity and as a CFS representative, made no attempt to explain or show remorse for his conduct. Thus, this case presents a situation in which Appellants engaged in sufficiently reprehensible conduct for which a small amount of economic damages was awarded.

Nevertheless, Appellants contend that the punitive damages caps set forth in § 510.265 indicate that Missouri law favors a limit on punitive damages of a 5:1 ratio. Section 510.265 provides that "[n]o award of punitive damages against any defendant shall exceed the greater of: (1) Five hundred thousand dollars; or (2) Five times the net amount of the judgment awarded to the plaintiff against the defendant." The Missouri Supreme Court explained that § 510.265 indicates that "the ratio of punitive damages should not be more than five times actual damages in cases with damages of more than $100,000, *but if the amount of actual damages was less than $100,000, then it authorized an award of up to $500,000 regardless of the size of the actual damage verdict.*" *Id.* (emphasis added). While the statutory framework of § 510.265 "cannot permit a punitive damage award larger than due process would allow, it is an additional indication that, in the case of small awards, due process does not prevent large ratios if necessary, given particular facts, to impose punishment and deter future misconduct." *Id.*

Accordingly, the punitive damages caps set forth in § 510.265 do not preclude a punitive damages award from exceeding a 5:1 ratio. Rather, § 510.265 provides support for the contention that large ratios between actual and punitive damage awards can still comport with due process given the facts and circumstances of a particular case. Thus, given the reprehensible nature of Appellants' misconduct and the small amount of economic damages awarded in this case, the disparity between the actual and punitive damages awarded is not indicative of a due process violation.

Finally, the third factor in assessing a punitive damages award requires us to evaluate the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. In doing so, we "should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *BMW of N. Am., Inc.,* 517 U.S. at 583, 116 S.Ct. at 1603. This factor, however, "is accorded less weight in the reasonableness analysis" than the previous two factors discussed above. *Krysa,* 176 S.W.3d at 163 n. 7.

The MMPA permits courts "to award the state a civil penalty of not more than one thousand dollars per [MMPA] violation." § 407.100.6. The MMPA also permits the Attorney General to seek an injunction or restitution on behalf of the State against persons engaging in unlawful merchandising practices. *See* §§ 407.100.1, 407.100.4. Additionally, the MMPA provides that consumers can bring private causes of action for MMPA violations and that consumers can, in bringing a private cause of action, seek both punitive damages and attorney's fees. § 407.025.

The punitive damages awards entered in this case exceed the civil penalties available under the MMPA. However, the MMPA clearly states that consumers wronged by a company's or person's unlawful merchandising practices has the right to bring a private cause of action. Individuals bringing such causes of action are permitted to seek punitive damages. Appellants, therefore, were apprised that engaging in unlawful merchandising practices could result in legal action for which punitive damages would be available. Thus, we cannot say that the punitive damages awards were unreasonable merely because they exceed the civil penalties available under the MMPA.

Having considered the factors set forth in *State Farm*, we are not left with the impression that the jury's punitive damages awards were grossly excessive in light of Appellants' repeatedly deceitful conduct and the small amount of economic damages awarded. Point denied.[11]

In sum, the judgment is reversed with respect to the actual damage awards entered against Appellants CFS and Franklin, and the case is remanded to the trial court with instructions to enter an amended judgment merging the actual damage awards against CFS and Franklin into a single award of $2,144.87. The judgment is affirmed in all other respects.

All concur.

---

**11.** Appellants suggest that, in the alternative, we "should remit the punitive damages awards pursuant to Section 510.263.6, RSMo 2005, Section 537.068, RSMo 2000, and Missouri Supreme Court Rule 78.10, on the basis that those awards are excessive under the evidence adduced at trial." Appellants make no further attempt to expand this argument in their briefing. Therefore, we decline to address it on appeal.