**Carrie A. PEEL, Respondent,**

v.

**CREDIT ACCEPTANCE CORPORATION, et al., Appellant.**

**No. WD 75409.**

Missouri Court of Appeals, Western District.

May 28, 2013.

Application for Transfer to Supreme Court Denied June 25, 2013.

Application for Transfer Denied Oct. 1, 2013.

Bernard E. Brown, Dale K. Irwin and Gina M. Chiala, Kansas City, MO, for respondent.

James F. Bennett and Robert F. Epperson, Clayton, MO and James R. Jarrow, Kansas City, MO, for appellant.

Before Division One: GARY D. WITT, Presiding Judge, THOMAS H. NEWTON, Judge and MARK D. PFEIFFER, Judge.

GARY D. WITT, Judge.

Carrie A. Peel ("Peel") purchased a used vehicle from Car Time L.L.C. ("Car Time"), a car dealership specializing in selling to those with credit problems, using credit extended by Credit Acceptance Corporation ("CAC"). Peel signed a sales agreement to purchase the vehicle and took possession but never received the vehicle's title. Peel's subsequent attempts to register the vehicle failed due to the lack of a title. Peel filed suit against both Car Time and CAC, alleging fraud, conversion, and violations of the Merchandising Practices Act ("MPA").[1] Car Time, whose dealership had since closed, did not answer, appear, or defend and was defaulted. Car Time is not a participant in this appeal. Following trial in the Circuit Court of Jackson County, the jury returned a verdict for Peel against CAC, finding it liable for violations of the MPA. The jury assessed actual damages of $11,007.81 and punitive damages of $1,187,505.00 against CAC. The trial court also assessed attorney fees of $165,350.00. The trial court, pursuant to the statutory cap in section 510.265,[2] reduced the punitive award to $881,789.05 "which is five times the result of adding together $11,007.81 in actual damages and $165,250.00 in attorney's fees, so that the assessment of punitive damages" is reduced to that cap amount. CAC timely appealed. For reasons explained below, we affirm.

1. The Merchandising Practices Act is found in chapter 407 of the Missouri Revised Statutes. It is referred to interchangeably in court opinions both as the MMPA (Missouri Merchandising Practices Act) and the MPA. For ease of reference, we will refer to it as the MPA. Only the MPA claim was submitted to the jury.

2. All statutory references are to RSMo 2000 cumulative as supplemented unless otherwise indicated.

## Factual Background [3]

On July 7, 2008, Carrie Peel ("Peel") went to Car Time in Independence, Missouri, to look at used vehicles.[4] Peel selected a 2005 Ford Taurus and proceeded to negotiate an agreement to purchase the car. Peel signed a Retail Installment Sales Contract which was a preprinted, copyrighted form prepared by CAC, whose name appeared on each page of the document. Peel was also required, as a condition of CAC providing financing and taking an assignment of the loan, to sign another CAC preprinted and copyrighted form, an "Agreement for Installation of a Vehicle Starter Interruption Device and GPS System." [5] The terms of the agreement to purchase the car were that Peel make a down payment of $800 in cash and trade in her Suburban (trade-in value $2,500), and the remainder of the purchase price of $17,580.21 was financed at an interest rate of 23.99 percent for a little over four years.

Peel took possession of the car but did not receive the title. Unbeknownst to Peel, the vehicle title was in possession of Great American Acceptance Corporation ("GAAC") which was the "Floor Plan Bank." [6] GAAC had loaned the money to Car Time to purchase its inventory, held the titles to the cars in that inventory, and had filed a UCC–1 showing its security interest in the inventory. Upon a sale, Car Time would pay a portion of the money from the sale to GAAC and then GAAC would provide the title to that car to Car Time so that it could complete the sale. In the Peel transaction and many others, Car Time sold the cars without paying GAAC and therefore could not provide the buyer with a title to the vehicle that was purchased.

When Peel attempted to register the car, she was told that she could not do so without the title. Prior to the expiration of her thirty-day temporary tag, Peel went back to Car Time to attempt to obtain the title, but found it had permanently closed. Peel then began contacting CAC directly to request the title. CAC told Peel that the only way she could obtain the car's title was to file a lawsuit against Car Time seeking a declaratory judgment. CAC also told Peel that she continued to owe them money under the sales contract and note despite the fact that Peel never received the title. Over the course of time, Peel spoke to CAC representatives more than one hundred times and was continually told that the title was not CAC's problem and she had to keep making the payments on the loan or CAC would disable the car with the ignition-interruption device, repossess the car, and report her to the credit bureaus. Based on other transactions that CAC was involved with regarding Car Time customers, CAC was aware that GAAC was the Floor Plan Bank for Car Time and was the probable possessor of the title. CAC never provided this information to Peel.

Peel's communications with CAC spanned around a year, during which time she continued to drive the car without proper registration because she needed it

3. "The pertinent facts are viewed in the light most favorable to the jury's verdict." *Hayes v. Price*, 313 S.W.3d 645, 648 (Mo. banc 2010).

4. Carrie and Philip Peel went to Car Time together; Philip Peel is not a party to this action.

5. This was an electronic device which, upon a missed payment, allowed CAC to remotely make the car inoperable and contained a GPS function that allowed CAC to find and repossess the vehicle.

6. A Floor Plan Bank loans money to an automobile dealership so that it can purchase its inventory.

to get to work and pick up her children. She also continued to make the monthly payments because she was trying to protect her credit rating and was afraid the car would be repossessed, leaving her family without transportation.

As Peel continued to drive the unregistered car, she was stopped multiple times by the police and received tickets and penalties. She also became anxious and embarrassed over the situation, especially after being pulled over with her son and his friend in the car. Peel contacted multiple attorneys but was unable to afford to proceed with the declaratory judgment action that CAC had told her she needed to file. After Peel lost her job, she qualified for Legal Aid, and only then was she informed that under Missouri law, if a buyer is not provided with a title to the vehicle, the sale is void and the buyer is relieved of the obligation to make payments on the debt. § 301.210; *Public Fin. Corp. of Kansas City, Mo., No. 1 v. Shemwell*, 345 S.W.2d 494, 497 (Mo.App. W.D.1961).

On June 7, 2010, Peel filed suit against Car Time and CAC, alleging fraud, conversion, and violations of the MPA. Ultimately, only the MPA claim was submitted to the jury.

Following a trial in the Circuit Court of Jackson County, the jury returned a verdict for Peel against CAC, finding it liable for violations of the MPA. Car Time did not answer or defend itself, and a default judgment was entered against it. The jury assessed actual damages of $11,007.81 and punitive damages of $1,187,505 against CAC. The court also assessed attorney fees of $165,350 against both defendants jointly and severally. The trial court, pursuant to section 510.265, reduced the punitive award to $881,789.05 "which is five times the result of adding together $11,007.81 in actual damages and $165,250.00 in attorney's fees, so that the assessment of punitive damages" is reduced to that cap amount. CAC timely appealed.

CAC alleges eight points of error, three of which allege error in the jury instructions and five of which allege error in the trial court's rulings on post-trial motions. As to jury instructional error, CAC alleges that the trial court erred in: (1) giving an instruction on the elements of an MPA violation which lacked the essential element that the offending practice occurred "in connection with" the sale of the car; (2) refusing to give a mitigation of damages instruction because Peel never pursued a declaratory relief action against Car Time to obtain the title; and (3) giving an instruction about the void status of a vehicle sale in which title does not pass because the instruction did not "fit the rules" for a non-MAI instruction.

As to the court's rulings on post-trial motions, CAC alleges the trial court erred in: (1) denying its motion for directed verdict and for judgment notwithstanding the verdict ("JNOV") because evidence showed that the alleged offending practice was not "in connection with" with the sale of the car and thus "outside" the MPA; (2) denying CAC's motion for directed verdict and for JNOV on Peel's punitive damage claim because Peel failed to present evidence that CAC's conduct was outrageous; (3) denying its motion for remittitur because the punitive damage award was disproportionate to the conduct; (4) denying its motion for a mistrial following Peel's opening statement in which Peel referred to a relationship between Car Time and CAC; and (5) granting Peel's motion for a directed verdict on and dismissing CAC's unjust enrichment claim because there was evidence that Peel drove the car and will receive the money back that she paid for it, making her unjustly enriched.

For ease of analysis, we will first address the three points regarding jury instructions and then address the five remaining points concerning rulings on post-trial motions.

Further facts are set forth as necessary.

## I.

### Standard of Review for Jury Instructions—Points I, III and VI

■ Whether a jury was instructed properly is a question of law this court reviews *de novo. Hervey v. Mo. Dept. of Corr.,* 379 S.W.3d 156, 159 (Mo. banc 2012) (internal citation omitted). "Review is conducted in the light most favorable to the record, and, if the instruction is supported by any theory, then its submission is proper.' *Id.* Instructional errors are reversed only if the error resulted in prejudice that materially affects the merits of the action." *Id.* The party challenging the instruction must show that the offending instruction "misdirected, misled, or confused the jury," resulting in prejudice to the party challenging the instruction. *Sutherland v. Sutherland,* 348 S.W.3d 84, 89 (Mo.App. W.D.2011) (citation omitted).

### Analysis on Point I

■ In Point One, CAC alleges that the trial court erred in submitting Instruction 8, which was the verdict director regarding the MPA claim. There is no MAI instruction for submitting an MPA violation. Where there is no applicable MAI, the instruction given shall be simple, brief, impartial, and free from argument. Rule 70.02(b).[7] Hence, in submitting an MPA violation count to a jury, either a modified MAI or non-MAI instruction setting forth the elements of the cause of action must be drafted. CAC alleges that the instruction erroneously lacked an essential element, in that the phrase "in connection with" the sale of the car was not a separately required finding that the jury had to make.

The elements of a violation of the MPA are found in section 407.020.1:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice. The use by any person, in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri of the fact that the attorney general has approved any filing required by this chapter as the approval, sanction or endorsement of any activity, project or action of such person, is declared to be an unlawful practice. Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

Peel submitted Instruction 8 as the verdict director for her claims under the MPA, which read as follows:

> Your verdict must be for plaintiff on her claim for violation of the Missouri Merchandising Practices Act if you believe:
>
> First, defendant represented to the plaintiff that she had to make payments

7. Unless otherwise indicated, all rule references are to the Missouri Court Rules (2012).

under the sale contract regardless of whether she received the title, and

Second, the conduct of defendant constituted the use of deception, misrepresentation, unfair practice, or omission of any material fact, and

Third, as a direct result of such conduct of defendant, the plaintiff was damaged, and

Fourth, plaintiff purchased the vehicle primarily for personal, family or household purposes.

Unless you believe plaintiff is not entitled to recover by reason of Instruction Number 9.

CAC submitted the following alternate verdict director on the MPA claim in instruction "A":

On plaintiff Carrie Peel's claim for violation of the Missouri Merchandising Practices Act, your verdict must be for plaintiff if you believe:

First, defendant Credit Acceptance unfairly collected payments from plaintiff in connection with the sale of the Ford Taurus, and

Second, as a direct result of such representation plaintiff Carrie Peel suffered a loss of money or property, and

Third, the loss was suffered by plaintiff Carrie Peel who purchased merchandise primarily for personal, family, or household purposes.

Unless you believe plaintiff Carrie Peel is not entitled to recover by reason of Instruction Number ____.

The court heard very limited arguments from both parties regarding the proper verdict director for this claim. CAC objected to Peel's instruction as follows: "We object to Instruction number 8 your Honor. First of all, paragraph number one does not contain any of the factual elements that relate to the statute. We have an alternative instruction that we would

submit." No other details were set forth nor argued by CAC. The court refused CAC's instruction, instead giving Peel's non-MAI "Instruction 8."

CAC alleges on appeal that the phrase "in connection with" must be included because it is an essential element of the MPA. Even if an essential element to an MPA claim is whether a violation is "in connection with" a sale, CAC failed to preserve this allegation of error.

Rule 70.03 mandates that counsel make specific objections to instructions considered erroneous. "This means that counsel must 'state distinctly the matter objected to and the grounds of the objection.' " *Gurley v. Montgomery First Nat'l Bank*, 160 S.W.3d 863, 869 (Mo.App. S.D.2005), quoting Rule 70.03. "As such, a simple objection on the basis that the instruction fails to state the applicable law or fails to contain all of the necessary elements of a cause of action, standing alone, is considered a general objection, preserving nothing for appellate review." *Id.* Here, CAC's objection was a general objection that preserved nothing for appellate review.

"Errors not preserved on appeal may be reviewed for plain error at the appellate court's discretion." *McGuire v. Kenoma, LLC*, 375 S.W.3d 157, 174 (Mo.App. W.D. 2012). "We will decline to exercise our discretion to review a claim of plain error unless the claim facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *Id.* (citation omitted). In *McGuire*, we held that where instructions used the word "utilized" instead of "controlled," there was no prejudice or resulting manifest injustice. *Id.* Similarly, here we do not believe that a manifest injustice ensued because the phrase "under the sale contract" as opposed to "in connection with" was used in the instructions. Indeed, as Peel asserted in oral argument,

the former is more specific than the latter. Thus, under a plain error review, this point of error fails as the giving of the instruction did not result in a manifest injustice.

However, even if this claim of error had been properly preserved, it would still fail. We note, *ex gratia*, that Rule 70 contemplates the frequent situations in which no MAI is applicable and provides for modification of an existing MAI or drafting of a "not-in-MAI" instruction. Rule 70.02(e); *Karnes v. Ray*, 809 S.W.2d 738, 740 (Mo. App. S.D.1991). The test of a modified MAI or not-in-MAI instruction is whether it follows the substantive law and can be readily understood by the jury. *Karnes*, 809 S.W.2d at 740. "As with the MAI's, a modified MAI or not-in-MAI instruction should require a finding of all ultimate facts necessary to sustain a verdict." *Id.* (internal citation omitted). A non-MAI "must be simple, brief, and free from argument." Rule 70.02. "To reverse for prejudicial instructional error, the instruction must have misled, misdirected, or confused the jury, and the test is whether an average juror would properly understand the applicable rule of law being conveyed by the instruction." *Gurley*, 160 S.W.3d at 869 (citation omitted).

When reviewing instructional errors where it was alleged that an essential element was omitted, we have held that where the essential element of fraud was not included in the verdict director, it was not reversible error because the presumption of prejudice was refuted by the record. *Citizens Bank of Appleton City v. Schapeler*, 869 S.W.2d 120, 130 (Mo.App. W.D.1993). *See also Lay v. P & G Health Care, Inc.*, 37 S.W.3d 310, 330–31 (Mo.App. W.D.2000) (where unmodified verdict director omitted beginning phrase "In your verdict you must assess a percentage of fault to defendant whether or not plaintiff was partly at fault if you believe ...," the

instruction neither caused a prejudicial effect nor affected the merits of the case); *McPherson v. Bi–State Dev. Agency*, 702 S.W.2d 129, 132 (Mo.App. E.D.1985) (where the element of agency remained a disputed fact under defendant's pleadings but defendant produced no evidence at trial to controvert it, the omission of the element of agency from the instruction was not reversible error); *Gurley*, 160 S.W.3d at 870 ("although the term 'justifiable' was not in the instruction, [defendant] does not advance any reason why the instruction as given did not comport to the substantive law or how inclusion of the term 'justifiable' would have better served an average juror in properly understanding the applicable rule of law"). "Essentially, [defendant's] argument is more semantics than substance." *Gurley*, 160 S.W.3d at 870. Thus, the absence of an element in a non-MAI instruction does not, in itself, require reversal.

Here, instruction 8 conveyed to the jury that in order to find that CAC had violated the MPA, Peel had to establish that CAC's actions were "under the sale contract." There is no dispute that the only sale involved in this case was the sale of the car. There is no other interpretation that an average juror could make in that there is *no other sale involved, no other vehicle involved*, and this was the only transaction discussed in the evidence. The instruction properly set forth "defendant represented to the plaintiff that she had to make payments *under the sale contract* regardless of whether she received the title." (Emphasis added).

Thus, even if this allegation of error had been preserved, we conclude that the absence of the phrase "in connection with" did not render an essential element lacking in the verdict director. For all of these reasons, Point One is denied.

## Analysis on Point III

█ The next allegation of instructional error relates to the trial court's refusal to submit CAC's proposed mitigation of damages instruction. CAC argues that its proposed "Instruction C" should have been submitted to the jury because the evidence at trial established that Peel did not take the one course of action through which she could have obtained title to the car, which was to independently hire counsel and file a declaratory judgment action against Car Time. CAC argues that Peel was told this by the DMV as well as by CAC representatives. However, there was also substantial evidence that GAAC, who had possession of the title and a proper security interest in the vehicle, would have opposed any such declaratory judgment action and that they it successfully opposed another such action brought by another Car Time customer.

At the instruction conference, CAC argued that Peel had a duty to mitigate her damages because "she had the opportunity to file a declaratory judgment action but she chose not to do so therefore she increased her own damages." There was no further argument and the court stated that although she thought it was "very close" she did not think it was "appropriate in this type of action."

As stated above, judgments based on instructional errors are reversed only if an error resulted in prejudice that materially affects the merits of the action. *Hervey*, 379 S.W.3d at 159. In a non-MAI instruction, "the burden to prove the error rests with the party challenging the instruction." *Mears v. Columbia Mut. Ins. Co.*, 855 S.W.2d 389, 393 (Mo.App. W.D.1993).

█ Failure to mitigate damages is an affirmative defense. CAC, in its answer alleged only, "6. Credit Acceptance asserts that Plaintiff failed to mitigate her damages." "This pleading is insufficient because it is merely a legal conclusion." *Echols v. City of Riverside*, 332 S.W.3d 207, 211 (Mo.App. W.D.2010). "In pleading an affirmative defense, 'it is necessary to set out the factual basis for the affirmative defense in the same manner as is required for the pleading of claims under the Missouri Rules of Civil Procedure.'" *Id.* (citation omitted). "A pleading that makes a conclusory statement and does not plead the specific facts required to support the affirmative defense fails to adequately raise the alleged affirmative defense, and the alleged affirmative defense fails as a matter of law." *Id.* (internal citations and quotation marks omitted). Since CAC failed to set forth any facts in its answer to support the legal conclusion regarding mitigation, the affirmative defense must fail. Without a properly pled affirmative defense, CAC is not entitled to an instruction regarding that defense.

Moreover, even if properly pled, as the trial court alluded to, the affirmative defense of mitigation of damages may be unavailable to defeat claims in the context of the MPA. Our Supreme Court recently held in *Huch v. Charter Communications, Inc.*, that "because of the act's broad scope and the legislature's clear policy to protect consumers, certain legal principles are not available to defeat claims authorized by the act." 290 S.W.3d 721, 725 (Mo. banc 2009) (citation omitted). There, the court held that, as a policy issue, the affirmative defense of the voluntary payment doctrine was thus unavailable in an MPA claim.[8]

---

8. Examples of other defenses that Missouri courts have found inapplicable to MPA claims include a contract's forum selection clause, rejected in *High Life Sales Co. v. Brown-* *Forman Corp.*, 823 S.W.2d 493, 498 (Mo. banc 1992), and estoppel, rejected in *Pointer v. Edward L. Kuhs Co.*, 678 S.W.2d 836, 844 (Mo.App. E.D.1984). *See also* 34 MO. PRAC.

However, because we do not have to reach this argument, we decline to affirmatively decide whether or not the affirmative defense of mitigation of damages is applicable in an MPA claim.

Based on the pleadings, we find no error in the trial court's refusal to submit a mitigation of damages instruction. Point Three is denied.

### Analysis on Point VI

CAC alleges in Point Six that the trial court erred in submitting Instruction 6 because it was an "inaccurate and abstract statement of law and violated Rule 70.02's requirements that a non-MAI instruction be impartial and free from argument in that it provided the jury with an incomplete and biased statement of the legal implications of failure to comply with the Missouri title delivery statute and did not require any finding by the jury."

The submitted instruction was with regard to section 301.210.4, which concerns the invalidity of a vehicle sale where the certificate of ownership does not pass to the buyer. The statute states:

It shall be unlawful for any person to buy or sell in this state any motor vehicle or trailer registered under the laws of this state, unless, at the time of the delivery thereof, there shall pass between the parties such certificates of ownership with an assignment thereof, as provided in this section, and the sale of any motor vehicle or trailer registered under the laws of this state, without the assignment of such certificate of ownership, shall be fraudulent and void.

Instruction 6 read:

You are instructed that the sale of a motor vehicle without the assignment and delivery of the certificate of ownership is fraudulent and void and the buyer has no obligation to make payments under the contract of sale.

■ CAC objected to the instruction on the ground that the last part, which stated that the buyer had no obligation to make payments under the contract of sale, was "inaccurate and is not contained in the statute." [9] The only relief requested of the trial court by CAC was that additional phrases be added to the instruction, which were likewise not found in the statute. CAC argued below "if the Court is going to give this instruction we would ask that an additional sentence be added to the instruction that states Credit Acceptance has no obligations under the contract. And as a second alternative we would say that it should say Car Time ... has no obligation under the contract."

CAC now contends, *inter alia*, that the instruction did not include the statutory responsibility of Peel to be given the title, which CAC argues unjustly placed blame on Car Time for the lack of a title being provided at the sale. CAC argues that

*Personal Injury and Torts Handbook*, § 29:8.3 ("because of the express policy enunciated by the MPA, various equitable defenses, such as waiver and estoppel, are not available in actions under the statute.").

9. Again, we note that pursuant to Rule 70.03, CAC is required to make specific objections before the trial court in order to preserve this issue for appellate review. At the instruction conference, CAC argued that the instruction was erroneous because it contained a statement that was "inaccurate and not in the statute." The other objections CAC makes on appeal were not preserved because CAC made only one objection to the trial court. "Where an alleged error relating to an instruction differs from the objections made to the trial court, the error may not be reviewed on appeal." *McGuire v. Kenoma, L.L.C.*, 375 S.W.3d 157, 174 (Mo.App. W.D.2012) (citation omitted). Therefore, we will only address the single issue preserved for our review.

while the statute clearly obligates both parties to ensure transfer title, Instruction No. 6 only informed the jury of the statute's prohibition regarding Car Time's sale of a car without a contemporaneous delivery of title. The instruction completely ignored the statutory language relating to *Peel's* obligation not to purchase a car without receiving title. (Appellant's Brief, p. 50)

This argument was not preserved for appellate review and is therefore denied. *Ex gratia* we note that this type of argument is exactly the type that the MPA was designed to cure. To blame the consumer for not being given something that the seller is required to produce is absurd. The word "assignment" implies that one person who has ownership must actively assign ownership to the other. Peel cannot assign herself ownership nor could she have passed a title to herself. The statute does not stand for this proposition, as can be clearly shown by both the context and plain meaning of the words used in section 301.210.

Section 301.210.1 begins by stating that "[i]n the event of a sale or transfer of ownership of a motor vehicle or trailer for which a [title] has been issued, the holder of such [title] shall endorse the same on assignment thereof . . . and deliver the same to the buyer at the time of the delivery to him of such motor vehicle." Section 301.210.2 then describes the process by which a buyer presents the title to the director of revenue to register the vehicle. Section 301.210.3 describes the process for selling the vehicle to someone outside of the state. And finally, section 301.210.4 states that it is unlawful for anyone to buy or sell a vehicle without going through the above process of passing title. Notably, the first subsection lays the responsibility on the seller of passing title. It is the seller who must deliver title to the buyer. Thus, the first half of the instruc-

tion specifically tracks the statutory language.

■■ The second part of the instruction, which CAC objected to on the ground that it contained language that was not contained in the statute, states that the "buyer has no obligation to make payments under the contract of sale." It is at least arguable that CAC properly preserved this argument. However, while not contained in the statute, Missouri courts have held that payments cannot be collected on void vehicle sales. *Public Fin.*, 345 S.W.2d at 497. The sale of a car fails and is necessarily considered fraudulent and void when the seller fails to deliver a certificate of title as required by section 301.210. *Id.* Our courts have long held that when an automobile is sold, noncompliance with the delivery requirement of 301.210 renders a purchase money note unenforceable for want of consideration, unless the holder is a holder in due course. *McIntosh v. White*, 447 S.W.2d 75, 80 (Mo.App. S.D. 1969) (citing *Public Fin.*, 345 S.W.2d at 497–98; *Smith v. G.F.C. Corp.*, 255 S.W.2d 69 (Mo.App.1953); *C.I.T. Corp. v. Byrnes*, 38 S.W.2d 750, 752 (Mo.App.1931); *Morgan v. Mulcahey*, 298 S.W. 242, 245 (Mo. App.1927)). Moreover, "where the seller does not properly assign his certificate and deliver it to the purchaser along with the automobile, the purchaser cannot . . . execute a valid mortgage on the vehicle since he has acquired no title." *In re Crewse*, 5 B.R. 391, 396 (Bankr.W.D.Mo. July 31, 1980) (citing *Albright v. Uhlig*, 315 S.W.2d 471 (Mo.App.1958)).

■ Instruction 6 contained the essential elements of the section, namely that if the above described process did not take place, the sale of the vehicle was fraudulent and void. "Section 301.210 is designed to hamper traffic in stolen cars and to prevent fraud and deceit in the sale of

used cars." *Reddish v. Heartland Auto Plaza,* 197 S.W.3d 634, 637 (Mo.App. S.D. 2006) (citation omitted). The intent of the legislature in using both the words "sell" and "buy" is to make it illegal for people to knowingly avoid passing title for illicit reasons. This concept is clear in the case cited by CAC, *Shivers v. Carr,* where both parties "attempted to unlawfully effect the transfer of the vehicle to Shivers by Carr's re-assignment of the Illinois certificate of ownership." 219 S.W.3d 301, 303 (Mo. App. S.D.2007). "Where parties enter into an agreement in violation of the law, they will, as a general rule, be left in the position in which they put themselves." *Id.* at 304 (internal citation and quotation omitted). The *Shivers* court emphasized that section 301.210 was "drastic, mandatory, and intended as a police regulation in the interest of the public welfare to prevent traffic in stolen automobiles, to aid in the apprehension of criminals, and to protect the innocent and guileless from the machinations and wiles of the wicked." *Id.* (citing *State v. Glenn,* 423 S.W.2d 770, 774 (Mo.1968)).

■ The only objection preserved here is CAC's objection to the additional language as being "inaccurate and not in the statute." Thus, we review the additional non-statutory language included to see if it materially affected the merits of the action or misdirected, misled or confused the jury, resulting in prejudice. *Hervey,* 379 S.W.3d at 159; *Sutherland,* 348 S.W.3d at 89. Here, the instruction conveyed that under the statute, a vehicle sale without a transfer of a title is fraudulent and void. This comes directly from the statute. The instruction further stated that a buyer in a void vehicle sale has no obligation to make payments under the contract of sale. This is also law, as held in *Public Finance,* 345

S.W.2d at 497. Thus, the instruction correctly stated the law.

Point Six is denied.

## II.

## Standards of Review for Post-Trial Relief Motions

### A. Standard of Review for Motion for Judgment Notwithstanding the Verdict

■ "The standard for reviewing a denied motion for JNOV is essentially the same as for reviewing the denial of a motion for directed verdict." *Sanders v. Ahmed,* 364 S.W.3d 195, 208 (Mo. banc 2012). "A case may not be submitted unless legal and substantial evidence supports each fact essential to liability." *Id.* Further, granting a motion for JNOV is a drastic action and should only be granted when reasonable persons could not differ on the correct disposition of the case. *Oak Bluff Partners, Inc. v. Meyer,* 3 S.W.3d 777, 783 (Mo. banc 1999). Whether plaintiff made a submissible case is a question of law; therefore, our review is *de novo. Moore v. Ford Motor Co.,* 332 S.W.3d 749, 756 (Mo. banc 2011). To determine whether the evidence was sufficient to support the jury's verdict, an appellate court views the evidence in the light most favorable to the verdict and the plaintiff is given the benefit of all reasonable inferences. *Bailey v. Hawthorn Bank,* 382 S.W.3d 84, 96 (Mo.App. W.D.2012) (citing *Keveney v. Mo. Military Acad.,* 304 S.W.3d 98, 104 (Mo. banc 2010)). This court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. *Sanders,* 364 S.W.3d at 208 (citation omitted).

## Analysis on Points II and IV—Denial of Motion for JNOV

Following the entry of the final judgment, CAC filed its Motion for JNOV. On appeal, CAC raises two of the points contained in that motion: (1) that Peel did not prove the essential element of her MPA claim that CAC's actions occurred "in connection with" the sale of the car (set forth in Point II), and (2) that the award of punitive damages was improper (set forth in Point IV). We will address them in turn.

We review the court's denial of a motion for JNOV to see if Peel made a submissible case on her MPA claim, which was the only claim submitted to the jury at trial. A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. *Sanders*, 364 S.W.3d at 208. The only element that CAC challenges on appeal is that Peel failed to establish that CAC's actions occurred "in connection with" the sale of the vehicle. Therefore we will address only that element in our analysis.

## Analysis on Point II—"In Connection With" Element of the MPA Claim

First, CAC contends that although Car Time violated the MPA by not providing a title to Peel at the time of sale, CAC did not commit any unfair or fraudulent practices in violation of the MPA, because all of its actions, even if unfair or fraudulent, were in connection with the collection of the note, not in connection with the sale of the vehicle.

Notably, CAC neither disputes that Car Time did not provide the title, nor that CAC continued to collect payments from Peel. Not providing a title is fraudulent. § 301.210. Collecting payment on a void contract to purchase a vehicle is also fraudulent. *See Public Fin.*, 345 S.W.2d at 498 ("Since the automobile sale in this case was absolutely void, there is no consideration for the note representing the sale price ... the note is wholly without consideration and unenforceable in the hands of plaintiff"). "For better or for worse, the literal words [of the statute] cover every practice imaginable and every unfairness to whatever degree." *Ports Petroleum Co. v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001).

The issue presented is whether CAC's actions were sufficiently "in connection with" the sale of the car to bring CAC under the purview of the MPA. In this case, the evidence established that CAC has three different possible connections with the sale: as an assignee of the sales contract, as a direct party to the sales contract, and as a financer of the sale.

### A. Assignment

 First, evidence presented by CAC was that it "paid the dealership for the assignment" of Peel's contract, making CAC an assignee, by its own admission. CAC's own contract acknowledges this:

> Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof ...

 In interpreting this identical clause in an automobile sales contract, the Eastern District explained in *Boulds v. Chase Auto Finance Corp.*, that this provision in a "Retail Installment Contract puts the holder in the shoes of the seller." 266 S.W.3d 847, 852 (Mo.App. E.D.2008) (citation omitted). "[T]he liability of the holder is as broad as that of the seller under the

FTC holder rule." [10] *Id.* "[W]hen an agreement is made in terms 'assigning' a bilateral contract, it is probable that the parties in most cases assume that a complete substitution can be made by which the assignor drops out and the assignee takes the assignor's place." 29 CHARLES WILLISTON, A TREATISE ON THE LAW OF CONTRACTS, § 74.35 (4th Ed.2013). Quite simply, the assignment of the sales contract to CAC carries with it the responsibility of owning that contract. "The general rule is that the assignee of a non negotiable obligation occupies exactly the same position with respect thereto that his assignor occupied." *United Fin. Plan, Inc. v. Parkview Drugs, Inc.,* 250 S.W.2d 181, 184 (Mo.App.1952). (citation omitted). "Such assignee takes subject to all defenses that might have been made against it while in the hands of the assignor at the time of assignment." *Id.* (citation omitted). And, as noted by the federal district court in a case against this same defendant, "[t]he retail installment contracts in this case are unquestionably subject to the Holder in Due Course Rule, meaning that CAC is subject to all claims and defenses the debtor could assert against the seller." *Fielder v. Credit Acceptance Corp.,* 19 F.Supp.2d 966, 979 (W.D.Mo.1998) *(vacated in part by Fielder v. Credit Acceptance Corp.,* 188 F.3d 1031 (8th Cir.1999)). Thus, by virtue of being an assignee, CAC is liable for Car Time's fraudulent sale.

**B. Direct Involvement with the Sale**

A second connection CAC had to the sale of car was a more direct one. Here, CAC was sufficiently connected to the sale because the evidence established that CAC (1) provided the financing that enabled the sale to take place, (2) provided the sales contract and all related documents that were on preprinted forms containing CAC's name and logo on each page, indicating CAC's involvement at the time of the sale, and (3) had an ongoing relationship with Car Time through a Dealer Contract that pre-existed Peel's sale and governed the high volume sale of contracts from Car Time to CAC.

The ongoing relationship between Car Time and CAC is evident from the bulk sale agreement, which, *inter alia,* defined the benefits of a High Volume Dealer (like Car Time), the absence of similar benefits for a Low Volume Dealer; the "capping" of dealer "pools" at one hundred contracts, CAC's right to offset money owed it by retaining profit due the Dealer and applying it to other accounts, and an acceleration clause that allowed for a termination fee equal to fifteen percent of all outstanding receivables owed to CAC. CAC's right to offset in particular demonstrates that the accounts of contracts are not completely stand-alone since CAC can apply certain funds to any account in its sole discretion. The agreement alone clearly reflects an ongoing relationship between Car Time and CAC. CAC even trained and certified its dealers like Car Time at its "Credit Acceptance University." Further, Peel testified that she believed Car Time and CAC "were one" since the contract was in both of their names or at least that CAC worked for Car Time at the time she entered into the sales transaction.

---

**10.** The Federal Trade Commission holder rule preserves consumers' defenses against subsequent holders by requiring a contractual notice provision in relevant contracts that provides in part, "[a]ny holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof." *See* 16 C.F.R. § 433.2.

## C. Interpretation of the MPA by Missouri Courts and Under Missouri Law

Another connection between CAC and the car sale can be adduced from an analysis and application of Missouri law to the facts at bar. Both parties cite to numerous cases on the issue of what "in connection with" means with regard to the original sales transaction. We will address the main holdings in turn.

CAC principally relies on *State ex rel. Koster v. Portfolio Recovery Associates* in support of its argument that it is not liable under the MPA for activity associated with the sale of the car because it was not involved in the transaction until after the sale took place. 351 S.W.3d 661 (Mo.App. E.D.2011). In *Portfolio Recovery,* the State, through the Attorney General, brought an action against a debt collector and its parent company for violations of the MPA. The State alleged that the defendants were using deceptive practices, *inter alia,* to collect debts from debtors, not all of which were valid. *Id.* at 662. The court narrowly focused on the phrase "in connection with" found in section 407.020.1, and concluded that because all of the alleged unfair and deceptive debt collection activities occurred after the initial transaction, Portfolio Recovery was not a party to the original transaction. *Id.* at 667. Thus, the Eastern District held that the MPA was inapplicable because the alleged violations were perpetrated by a third-party collection agency that was not involved with, nor had any connection to, the original purchase of merchandise. *Id.* at 668.

In the instant case, the Attorney General filed a brief as *amicus curiae* to argue that *Portfolio Recovery* was wrongly and too narrowly decided under the statute and requests that this court reject *Portfolio Recovery* outright.

Contrary to the narrow analysis in *Portfolio Recovery,* our Supreme Court has addressed the legislature's use of the phrase "in connection with" in the MPA and construed it liberally. *Gibbons v. J. Nuckolls, Inc.,* 216 S.W.3d 667, 668 (Mo. banc 2007). The court held that a wholesaler who sold a car to a dealer who then sold it to the plaintiff was liable to the plaintiff/buyer under the MPA when the wholesaler failed to inform the dealer that the car had previously been in an accident. *Id.* at 668. The wholesaler argued that since it lacked privity to the buyer, its actions were not in connection with the sale of the car. *Id.* at 668. It asserted that "private plaintiffs can only sue a direct seller." *Id.* at 670. It further argued that an action against it under the MPA could only be brought by the Attorney General. *Id.* at 670. Our Supreme Court, however, "decline[d] to impose such a significant limitation on Missouri consumers." *Id.* at 670. The court emphasized that the statutory framework of sections 407.020, 407.025 and 407.010 "does not contemplate a direct contractual relationship between plaintiff and defendant, and Missouri courts have not imposed such a requirement through statutory construction." *Id.* at 669. Thus, our Supreme Court has held that the phrase "in connection with" encompasses a third-party wholesaler whose failure to disclose defects affected the sale, which was the transaction at issue. *Id.*

The Southern District of this court has also addressed the breadth of the phrase "in connection with" under the MPA in *Schuchmann v. Air Services Heating & Air Conditioning, Inc.,* 199 S.W.3d 228 (Mo.App. S.D.2006). In that case, the seller of an air conditioner failed to honor a lifetime warranty. *Id.* at 230–31. The seller argued that because the buyer failed to show that the seller had the intent not to honor the warranty at the time of sale, the buyer failed to establish that the alleged deceptive practice was "in connection with" the sale under the MPA. *Id.* at 232.

Even though the evidence was that the decision not to honor the warranty occurred five years after the sale, the Southern District held that the statute and the regulations drafted pursuant thereto, "paint in broad strokes to prevent evasion thereof due to overly meticulous definitions." *Id.* at 233 (citation omitted). Indeed, by its own terms, the MPA applies to abuses that occur "before, during or after" the sale. § 407.020.1.

In interpreting this section, our courts have held that the "plain and ordinary meaning of the words themselves ... are unrestricted, all-encompassing and exceedingly broad." *Ports Petroleum Co., Inc. of Ohio v. Nixon,* 37 S.W.3d 237, 240 (Mo. banc 2001) (citation omitted). "For better or worse, the literal words cover every practice imaginable and every unfairness to whatever degree." *Id.* The definition of "sale" under the MPA includes: "any sale, lease, offer for sale or lease, or attempt to sell or lease merchandise for cash *or on credit.*" § 407.010(6) (emphasis added). The MPA also defines "trade" or "commerce" as "the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and *any other article, commodity, or thing of value wherever situated.*" § 407.010(7) (emphasis added). The terms "trade" and "commerce" include "any trade or commerce directly or indirectly affecting the people of this state." § 407.010(7). It cannot be seriously argued that the debt and security interest in a vehicle is not a "thing of value." CAC paid $5,500 to purchase the contract for the debt from Car Time.

We find the analysis of *Portfolio Recovery* less than persuasive. We also find the current case factually distinguishable from *Portfolio Recovery.* Here, unlike *Portfolio Recovery,* where the debt was sold long after the underlying transaction, CAC had a relationship with the buyer from the onset of the transaction. The original loan documents prepared by CAC and executed contemporaneously with this sale, specifically state that "The Seller [Car Time] has assigned this Contract to" CAC.

CAC also cites to an unreported case, *DePeralta v. Dlorah, Inc.* where a federal district court held in its grant of summary judgment that because the alleged MPA violation was not "in connection with" the plaintiff's purchase of an educational course, the MPA claim failed. No. 11–1102–CV–SJ–ODS, 2012 WL 4092191 (W.D.Mo.2012). But *DePeralta* is inapposite. There, the issue was whether the pay scheme for admissions recruiters for a school, which was based on commission for the number of students it enrolled in its program, was related to the plaintiff's purchase of a program that allegedly misrepresented itself. *Id.* at *7. "The question becomes, then, whether Defendant's violation of the DOE's [Dept. of Education] regulations constitutes an unfair practice within the meaning of the MMPA." *Id.* Specifically, the plaintiff alleged that the program was not seeking American Bar Association certification as it said it was, many credits were not transferrable to other schools' programs as it represented, books were not included in tuition pricing, certain required classes were only offered at one of the two campuses, there was a required internship, the loan default rates for its students were high, and the employment rate for its graduates was low. *Id.* at *1–3. The district court granted the defendant's motion for summary judgment, finding that the MPA claim failed due to a lack of connection between the recruiter's salary incentive scheme and the actual misrepresentations about the educational program that was purchased. *Id.* at *8.

Here, the issue is not a lack of a connection between the car purchase and the

activity of CAC. CAC would only be involved if it financed the car's purchase. In other words, there would be no purchase if CAC had not been involved. Unlike the situation in *DePeralta,* the car purchase is directly connected in that the fraudulent sale triggering fraudulent collection of installment payments is what is at issue. In fact, our federal district courts have held that (1) an extension of credit falls under the definition of merchandise under the MPA, and (2) even if the finance company was not a part of the original sale, it has liability for actions it takes in collection of the debt. *Huffman v. Credit Union of Texas,* No. 11–0022–CV–W–ODS, 2011 WL 5008309, at *5 (W.D.Mo. Oct. 20, 2011). "Given that it was a party to this transaction, and given that the MMPA applies to unfair practices that occur 'before, during or after' the transaction, the Court cannot conclude Defendant is entitled to judgment on the pleadings." *Id.* at *6. Thus, the *Huffman* court concluded that the service of financing was in itself sufficiently connected to a sale such that it was within the reach of the MPA and allowed the claim to stand. *Id.* We find neither *DePeralta* nor *Portfolio Recovery* persuasive on this issue.

We rely on our Supreme Court's holding in *Gibbons,* the Southern District's holding in *Schuchmann* and the district court's interpretation of Missouri law in *Huffman,* in concluding that there was substantial evidence establishing that CAC's actions were "in connection with" the sale such that CAC's actions fell under the MPA.

We find no error in the trial court's denial of CAC's motion for JNOV. For all of the above reasons, Point Two is denied.

### Analysis on Point IV—Punitive Damage Claim

 CAC alleges that the trial court erred in denying its motion for JNOV because the punitive damage award was improper. It contends that Peel did not present evidence that CAC's conduct was outrageous and thus the court should have granted the motion.

"Essentially, a JNOV motion is a challenge to the submissibility of the case." *Bailey,* 382 S.W.3d at 102 (citation omitted). Thus, our review of this case is limited to "whether or not, as a matter of law, the plaintiff presented enough evidence to submit a claim of punitive damages to the jury." *Id.* (citation omitted).

CAC argues that Peel presented no evidence that CAC acted outrageously or with an evil motive. CAC points to its efforts to assist Peel obtain the title as proof that it was not acting with reckless disregard for Peel's rights and interests. It also contends that it later changed its policies in an effort to "address the unique challenges presented by Missouri's title law," which it stressed at trial was largely responsible for Peel's predicament. Further, CAC asserts that the failure of a dealer to provide a title was not a common occurrence. Finally, CAC contends that the absence of evidence portraying CAC's evil intent or culpable state of mind precludes an award of punitive damages.

 "To make a submissible case for punitive damages, there must be 'clear and convincing proof of [a defendant's] culpable mental state.'" *Bailey,* 382 S.W.3d at 103 (internal citation omitted). Thus, a plaintiff makes a submissible case for punitive damages when he or she presents clear and convincing evidence from which a reasonable jury could conclude that the defendant had an evil motive. *Id.* (citation and internal quotation marks omitted). "A plaintiff establishes a defendant's culpable mental state 'by showing

either that the defendant committed an intentional wanton, willful, and outrageous act without justification *or acted with reckless disregard for the [plaintiff's] rights and interest.'* *Id.* (emphasis added). Thus, a jury can *infer* the defendant's evil motive when the defendant recklessly disregards the interests and rights of the plaintiff. *Id.* (internal citation omitted and emphasis added). "Direct evidence of fraud rarely exists, [b]ut fraud, like any other fact, may be established by circumstantial evidence." *Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC,* 361 S.W.3d 364, 371 (Mo. banc 2012) (internal citations and quotation marks omitted).

The jury was presented with evidence that CAC, *inter alia,* continued to collect payments from Peel after it was aware that she did not receive the title, did so under threat of making the car inoperable and repossessing it, reported Peel as late on her payments to credit reporting agencies which in turn affected her credit score, hindered her ability to purchase another car, and told Peel that the missing title was "not our problem." Additionally, evidence was presented that multiple Car Time customers also experienced similar dealings with CAC over void sales that lacked titles. CAC's witnesses explained that the company was large, that it was unaware of Peel's title problem for quite some time, and that of all other states in which it did business, Missouri was the only one that required the dealer to give the title directly to the buyer. The jury was free to believe or disbelieve this evidence. *Keveney,* 304 S.W.3d at 105.

In contrast to CAC's evidence, Peel's testimony was that (1) within thirty days of her purchase of the car, she reported the lack of title to CAC, (2) she repeatedly asked to speak to someone in CAC's legal department and was misled and told that CAC did not have a legal department; (3)

she informed CAC countless times over the course of a year in documented phone calls to CAC that she did not receive the title; and (4) that she was told she had to keep making payments on the note even though she had not received the title, which was finally dispelled by a Legal Aid attorney with whom she consulted.

Our review of the record also reveals that CAC has been operating in Missouri in the car loan business since at least 1992; thus, it was reasonable for the jury to infer that it should have been aware of Missouri's "unique" title procedures and should have been aware that it was unlawful to attempt to collect a debt on a void vehicle sale. Yet, until at least 2011, CAC still entered into Dealer Agreements across Missouri and was still attempting to collect on debts of buyers who had not received title, in violation of Missouri law. In attempting to collect these void debts, CAC used threats and intimidation. Further, numerous references were made by CAC employees that problems with titles were handled by various people and not centralized until recently in its Title Department, confirming that CAC was sufficiently aware of title issues to have designated certain employees to address them.

While CAC claims in its brief that it took efforts to assist Peel in obtaining the title, this allegation is contradicted by the evidence. The evidence was that the only effort CAC took to "assist" Peel in obtaining the title was to advise her to file a declaratory judgment action against Car Time. There was evidence that CAC was aware that GAAC was the "Floor Plan Bank" for Car Time and was the most likely entity to have the title to Peel's vehicle, but CAC failed to provide this information to Peel. Despite more than one hundred contacts by Peel regarding the title to this car, CAC continued to maintain that "it is not our problem." A reasonable

jury could regard this conduct as outrageous. Despite the answers given by CAC employees, "there was sufficient evidence from which the jury could reject these excuses." *Bailey,* 382 S.W.3d at 103–4. As we noted in *Bailey,* a jury can *infer* the defendant's evil motive when the defendant recklessly disregards the interests and rights of the plaintiff. *Id.* at 103.

For all of these reasons, the jury could have concluded that CAC acted outrageously towards Peel. Thus, we see no error in the trial court's denial of CAC's motion for JNOV because the record contains legally sufficient evidence to support the submission of punitive damages to the jury. Point Four is denied.

### C. Standard of Review for Denial of Motion for Remittitur

 We review the trial court's denial of a motion for remittitur for an abuse of discretion. *Johnson v. Allstate Indem. Co.,* 278 S.W.3d 228, 236 (Mo.App. E.D. 2009) (citation omitted). "The trial court's determination will not be disturbed on appeal absent an abuse of discretion so grossly excessive that it shocks the conscience and convinces this court that both the trial judge and the jury have abused their discretion." *Id.* (citation omitted).

> Remittitur is appropriate where the jury's verdict is excessive. A jury's verdict will be deemed excessive when it exceeds fair and reasonable compensation for the plaintiff's damages. This court will defer to the trial court's decision whether to remit a verdict since the trial court is in a superior position to observe the witnesses, including the plaintiff.

*Id.* (citations omitted).

When a trial court rules a motion for remittitur, we review the evidence in the light most favorable to the trial judge's decision. *Badahman v. Catering St.*

*Louis,* No. SC92796, 2013 WL 1422187, at *6 (Mo. banc April 9, 2013).

### Analysis on Point V—Denial of Motion for Remittitur

 CAC argues that the trial court's denial of its motion for remittitur on the punitive damage award was erroneous because the jury's award of punitive damages was unsupported by the evidence, and as such, was in violation of CAC's due process rights under the Fourteenth Amendment to the United States Constitution. "We review the trial court's determination of the constitutionality of the punitive award *de novo,* deferring to the trial court's findings of fact, unless they are clearly erroneous." *Heckadon v. CFS Enter., Inc.,* No. WD74288, 2013 WL 1110690, at *6 (Mo.App. W.D. Mar. 19, 2013) (citation and internal quotation marks omitted).

 Punishing a tortfeasor through an award of punitive damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment. *Id.* at *6. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. *Id.* (citation omitted). "A grossly excessive punitive damage award, therefore, violates a tortfeasor's substantive right of due process in that 'it furthers no legitimate purpose and constitutes an arbitrary deprivation of property.'" *Overbey,* 361 S.W.3d at 372.

 "No precise constitutional line or simple mathematical formula exists with regard to determining whether a punitive damages award is grossly excessive." *Heckadon,* 2013 WL 1110690 at *6 (quoting *Krysa v. Payne,* 176 S.W.3d 150, 156 (Mo.App. W.D.2005)). "Rather, the imposition of punitive damages requires a proper balance be struck between the need for

punishment to deter future misconduct and the severity of the award." *The Fireworks Restoration Co., LLC v. Hosto,* 371 S.W.3d 83, 91 (Mo.App. E.D.2012) (citation omitted). Accordingly, courts reviewing an award of punitive damages consider three factors in determining whether a punitive damages award is grossly excessive: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Overbey,* 361 S.W.3d at 372 (citing *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

"The reprehensibility of defendant's conduct is the most important consideration in determining the reasonableness of a punitive damages award." *Heckadon,* 2013 WL 1110690, at *7. In assessing the reprehensibility of CAC's misconduct, we consider whether:

> (1) the harm was physical as opposed to economic; (2) the conduct evinced indifference to health or safety of others; (3) the target of the conduct was financially vulnerable; (4) the conduct involved repeated actions or was an isolated incident; or (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.*

In evaluating the reprehensibility of CAC's actions, "we defer to the factual findings of the jury and the trial court and 'are limited to a consideration of the evidence which supports the verdict excluding that which disaffirms it.'" *Krysa,* 176 S.W.3d at 157 (citations omitted). "In other words, we view the evidence and all reasonable inferences in the light most favorable to the verdict and disregard all contrary evidence and inferences." *Id.*

CAC argues that evidence at trial did not reflect that its conduct was intentional, outrageous or reckless. It contends that its conduct during the collection process did not involve intentional malice, trickery, or deceit and, thus, was not reprehensible. CAC further argues that its conduct did not result in physical injury to others.

*Heckadon* is similar to the instant case. 2013 WL 1110690, at *1. There, a car dealer used deceptive and misleading advertisements to induce the buyers to participate in a four-year car program. *Id.* at *7. The owner of the dealership knew that the advertising was misleading to consumers. *Id.* We noted that while the dealer's conduct resulted primarily in economic harm, as opposed to physical harm, that did not negate the fact that the evidence established the dealer used trickery to target financially vulnerable consumers and that it repeatedly engaged in such misconduct. *Id.*

Here, there is economic harm, as even CAC stated in closing argument that Peel suffered approximately a $12,000 loss. Peel also incurred substantial attorney's fees. Peel was financially vulnerable as her credit score was already low when she went to Car Time and agreed to a 23.99 percent financing rate in order to obtain a car. CAC's responses to Peel that the title "was not [their] problem" indicates indifference. CAC's other response to Peel's calls that its collections people "only deal with payments" is also indicative of indifference. Further, Peel consistently asked to speak to a supervisor, was told a supervisor would call her back, and no one ever did. There was also repeated conduct by CAC as was shown by four other witnesses who testified regarding their experiences with CAC's aggressive tactics to collect on void vehicle sale contracts.

Moreover, there was evidence of deceit when CAC told Peel that it did not have a legal department. Evidence of trickery was established by CAC continuing to aggressively threaten Peel to "encourage" her to make car payments even though it knew the sale was void and the debt uncollectable under Missouri law for lack of a title transfer.

We next consider the disparity between the actual harm Peel suffered and the punitive damages awarded. CAC contends that the ratio of punitive damages to actual damages is "considerable." The jury awarded $11,007.81 in compensatory damages and $1,187,505 in punitive damages, which the court reduced to $881,789.05 pursuant to the statutory cap in section 510.265. The court also awarded $165,350 in attorney fees.

CAC contends that it is difficult to ascertain any harm that Peel suffered. CAC asserts that when the whole picture is taken into account, the only "real loss" Peel sustained was the difference between driving a titled car and driving an untitled one. This argument shows CAC's continued indifference to Peel's plight. While it is true that Peel had obtained a car, she was paying for it while terrified of driving it for fear of being pulled over, getting more tickets, being arrested, having her already poor credit rating further damaged, having the car rendered immobile and repossessed by CAC, and perceiving no way to get the vehicle legally titled. Because she was already financially vulnerable, she could not easily afford to pay extraneous tickets or fines or lawyers and had no way to obtain another properly titled car. CAC argues that the technicality of driving with or without a title is the disparity that should guide us in reviewing the jury's award. We disagree.

The disparity that should be analyzed is the disparity between the benefit of the bargain that Peel received versus the benefit of the bargain that CAC received. Peel bargained to purchase a car that she could legally drive. She did not receive that; rather, she received one that could only be driven illegally. On the other hand, CAC paid for a sales contract and note on which it received monthly installment payments. It, in fact, received those payments because it ensured Peel paid under threat of making the car immobile at any moment using the remote GPS ignition device, threat of repossession, and threat of further damage to her credit rating. The jury had this evidence of inequity before it when it awarded its damages. CAC argues that this award reflects a ratio of 107:1. But as we noted in *Heckadon*, even a disparity of 187:1 does not, in and of itself, make the punitive damage award inherently excessive. *Id.* at *8.

CAC argues that Peel is limited to a ratio of 5:1 between actual and punitive damages pursuant to section 510.265. This argument conflates the constitutional due process argument with the requirements of the statute. In addition, CAC misreads the statute. The statutory language CAC relies on specifically provides that punitive damages shall not exceed "five times the net amount of the judgment awarded to the plaintiff against the defendant." § 510.265(2). The language regarding the "net amount of the judgment" includes attorney fees. *Hervey*, 379 S.W.3d at 164. The trial court has already, pursuant to the statute, reduced the punitive damages from the jury's award of $1,187,505 to the ratio of 5:1 of the net amount of the judgment or $881,789.05. Peel does not challenge this reduction of the punitive damage award on appeal. The punitive damage award in this case does in fact reflect a single digit ratio (5:1)

between actual and punitive damages. Thus, the award complies with the statute.

As to the constitutionality of the award, the United States Supreme Court "has been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 410, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Rather, the precise award in any case must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff. *Overbey,* 361 S.W.3d at 373 (internal quotation omitted). Our Supreme Court has indicated that deviation from the single-digit ratio of actual to punitive damages "may comport with due process where a 'particularly egregious act has resulted in only a small amount of economic damages.' " *Id.* (quoting *State Farm,* 538 U.S. at 423, 123 S.Ct. 1513). More specifically, in *Overbey,* our Supreme Court upheld a punitive damage award of $500,000 against the defendant for deceptive conduct despite the fact that the actual damages awarded against it were only $4,500, resulting in a 111:1 ratio between actual and punitive damages. *Id.* at 373–74.

Here, the facts and circumstances of this case would support a deviation from the single-digit ratio between actual and punitive damages. This is a situation in which CAC used its superior position to misrepresent to Peel that she owed payments under a void sale contract. Similar misconduct by CAC affected numerous people in Missouri. Further, CAC's explanations at trial rang hollow as it blamed Missouri for having a "unique" title system (even though it had been doing business in Missouri since 1992), likened its own actions to those of the state revenue department in collecting property taxes, despite the lack of Peel's ownership of the car, and basically emphasized that it was only treating Peel the same as all the other state agencies treated her. CAC made no attempt to explain or show remorse towards Peel for its conduct; instead, it threatened her to keep making payments, repossessed the car, reported her to credit agencies, eliminated her positive payment history from her credit report, and sued her under the void contract. Thus, this case presents a situation where CAC engaged in sufficiently reprehensible conduct for which a small amount of actual economic damages was found.

"Finally, the third factor in assessing a punitive damages award requires us to evaluate the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Heckadon,* 2013 WL 1110690, at *9. "In doing so, we 'should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.' " *Id.* (quoting *BMW,* 517 U.S. at 583, 116 S.Ct. 1589). However, this factor "is accorded less weight in the reasonableness analysis than the previous two factors discussed above." *Heckadon,* 2013 WL 1110690, at *9 (citation omitted).

The MPA permits the state to pursue an action under the MPA and allows a court to award the state an injunction, restraining order, receiver, and a civil penalty of not more than one thousand dollars per violation. § 407.100.6. Additionally, the MPA provides that consumers can bring private causes of action for MPA violations and that consumers can, in bringing a private cause of action, seek actual as well as punitive damages and attorney fees. § 407.025.1. The punitive damage award entered in this case exceeds the civil penalties available under the MPA. CAC was aware of the MPA and had been doing business in the same manner since 1992.

Thus, we cannot say that the punitive damage award was unreasonable merely because it exceeds the civil penalties available under the MPA.

For all of the above reasons and in viewing the evidence in the light most favorable to the verdict, we find no abuse of discretion in the trial court's denial of CAC's motion for remittitur. Thus, Point Five is denied.

### D. Standard of Review for Denial of Motion for Mistrial

 A mistrial is a drastic remedy. *Brown v. Bailey*, 210 S.W.3d 397, 411 (Mo. App. E.D.2006) (citation omitted). The decision to grant a mistrial is largely within the discretion of the trial court, and we will reverse a denial of a motion for mistrial only when there has been a manifest abuse of discretion. *Id.* A manifest abuse of discretion occurs only when the error is so grievous that the prejudice cannot be removed. *Id.* "The trial court is in a better position to assess the prejudicial effect of improper evidence on the jury and to evaluate whether any resulting prejudice can be cured by less drastic means than granting a mistrial." *Id.*

### Analysis on Point VII—Denial of CAC's Motion for Mistrial

 During Peel's opening statement, Peel referenced that a voluntary meeting had recently taken place between the owner of Car Time, John Cooney, and representatives of CAC, arguing that CAC was still working with the prior owner of the now-defunct, Car Time. CAC objected on the grounds that the court had earlier granted its motion *in limine* to exclude all references to a particular affidavit submitted by Cooney. The affidavit was prepared by Cooney after the meeting referenced by counsel; however, Cooney's statements in the affidavit were later determined to be false. No mention of the affidavit was mentioned or argued before the jury. Following its objection, CAC made an oral motion for a mistrial based on what it perceived as prejudice as a result of Peel's "violation" of the order *in limine*. CAC argued that the prejudice came from the jury thinking that CAC controlled the actions of Car Time, which it could conclude by Peel's reference to this meeting between Car Time's owner and counsel for CAC. The court overruled CAC's motion for a mistrial and instructed Peel to emphasize that this was a "voluntary" meeting and not to go any further with this argument. Peel complied.

On appeal, CAC claims that the comment in opening statement prejudiced the jury against CAC by implying that Car Time and CAC acted together or that CAC approved of the actions of Car Time. CAC contends that since it "never defended the conduct of Cooney or Car Time, in order to avoid the taint of Cooney's intentional misconduct, it was critical to CAC not to have Cooney's or Car Time's conduct imputed to CAC." CAC also contends that there was no lesser remedy which could cure the resulting prejudice.

As noted above, we review the denial of a mistrial for a manifest abuse of discretion. *Id.* A manifest abuse of discretion is one where the prejudice cannot be removed. *Id.* Here, the comment came during the first few minutes of a four-day trial. CAC had the entire trial in which to present evidence to the jury that CAC did not control Cooney or Car Time. CAC in fact presented testimony and argued in closing arguments that this was not the case. Further, since the order *in limine* precluded only references to Cooney's false affidavit, there was not an actual violation of the court's pre-trial ruling. In sum, we find no abuse of discretion by the court in overruling CAC's oral request for

a mistrial during Peel's opening statement. Point Seven is denied.

### E. Standard of Review for Grant of Motion for Directed Verdict

We review the grant of a motion for directed verdict under essentially the same standard as a JNOV. *Bailey*, 382 S.W.3d at 96. We review to see if the moving party made a submissible case on the claim advanced. *Id.* "The purpose of motions for directed verdict ... is to challenge the submissibility of the plaintiff's case." *Id.* at 99.

### Analysis on Point VIII—Grant of Peel's Motion for Directed Verdict Dismissing CAC's Claim for Unjust Enrichment

Here, CAC filed a counter-claim against Peel alleging unjust enrichment in that she continued to benefit from the use of the car from July 2008 to mid–2010 and drove it more than 16,000 miles. CAC alleged that the benefit conferred on Peel was at CAC's expense because CAC had paid Car Time $5,500 for the sale contract and held a lien on the car. At the close of trial, Peel moved for a directed verdict on CAC's unjust enrichment claim, claiming that CAC did not prove all the elements of unjust enrichment. The court granted Peel's motion.

Under Missouri law, "[o]ne who confers a benefit upon another due to a mistake is entitled to restitution." *Homecomings Fin. Network, Inc. v. Brown*, 343 S.W.3d 681, 685 (Mo.App. W.D.2011) (citation omitted). To establish the elements of an unjust enrichment claim, CAC must prove that (1) it conferred a benefit on Peel, (2) Peel appreciated the benefit, and (3) Peel accepted and retained the benefit under inequitable and/or unjust circumstances. *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo.App.

W.D.2010) (citation omitted). "Unjust retention of benefits only occurs when the benefits were conferred (a) in misreliance on a right or duty; or (b) through dutiful intervention in another's affairs; or (c) under constraint." *Id.* (citation and internal quotation marks omitted). Even if a benefit is conferred and appreciated, if no injustice results from the retention of the benefit, then no cause of action for unjust enrichment will lie. *Id.*

In support of its position, CAC cites to *Homecomings Financial Network, Inc.* In *Homecomings*, we held that a homeowner who was a victim in a fraudulent refinancing scheme unjustly benefitted by not paying monthly loan payments when he suspected his refinanced loan was fraudulent. *Id.* at 685. For the purpose of equity, we ordered reimbursement to the mortgage company, who was also a victim in the scheme and who had been paying taxes and insurance for years without any contribution from the homeowner, despite the homeowner living in the home. *Id.* CAC argues that it, like Homecomings, was a victim in a scheme which resulted in Peel benefitting from CAC's misfortune in buying a void sale contract. CAC maintains that it had nothing to do with the underlying fraudulent transaction and was entitled to have its claim for unjust enrichment submitted to the jury. We disagree.

The benefit of a car was not conferred upon Peel by CAC; rather, the car was conferred upon Peel by Car Time. CAC knew that Peel did not have the title. Yet, it pressured her to continue to make car payments even while it knew the sale contract was void. CAC told her that even if she did not drive the car, she was still obligated to make payments under the contract. Alternatively, she could allow it to repossess the car, but the repossession would go on her credit report and any positive aspects of her numerous timely

payments would be deleted from her credit report. In addition, CAC informed Peel that if it repossessed the car, it may pursue an action for any deficiency against her.

In *Howard*, we noted that even if a benefit was conferred, if no injustice resulted, then "no cause of action for unjust enrichment will lie." 316 S.W.3d at 436 (citation omitted). We do not find that CAC made a legally submissible case on its claim of unjust enrichment because it did not offer evidence that it conferred any benefit on Peel and failed to offer evidence that CAC suffered an injustice to it as a result of the conferred benefit. Thus, we find no error in the court's grant of Peel's motion for directed verdict, dismissing CAC's claim against Peel for unjust enrichment. Point Eight is denied.

### Conclusion

The judgment of the trial court is affirmed. As the prevailing party, we grant Peel's motion for attorney fees on this appeal. Although this court has "the authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Rosehill Gardens, Inc. v. Luttrell,* 67 S.W.3d 641, 648 (Mo.App. W.D.2002) (citation omitted). Therefore, we remand this matter to the trial court for the sole purpose of determining and ordering reasonable attorney fees incurred by Peel on this appeal.

All concur.